980 F.2d 478
 35 ERC 1761, 24 Fed.R.Serv.3d 1032,
23 Envtl. L. Rep. 20,461
 UNITED STATES of America, Appellee,
v.
MEXICO FEED AND SEED COMPANY, INC.; James F. Covington,
Individually; Mary J. Covington; James F.
Covington, doing business as Mexico Feed
and Seed Company, Appellees,
Jack Pierce, Individually and as a Director of Pierce Waste
Oil Service; Pierce Waste Oil Service, Inc.;
Martin J. Pierce, a Director of Pierce
Waste Oil Service, Inc.,
Moreco Energy, Inc., Appellant.
UNITED STATES of America, Appellee,
v.
MEXICO FEED AND SEED COMPANY, INC.; James F. Covington,
Individually; Mary J. Covington; James F.
Covington, doing business as Mexico Feed
and Seed Company, Appellees,
Jack Pierce, Individually and as a Director of Pierce Waste
Oil Service; Pierce Waste Oil Service, Inc., Appellants,
Martin J. Pierce, a Director of Pierce Waste Oil Service, Inc.,
 Nos. 91-3085, 91-3090.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 8, 1992.
Decided Nov. 16, 1992.
 
 Thomas J. Immel, Springfield, Ill., argued for Moreco Energy, Inc.
 Bradford A. Brett, Mexico, Mo., argued for appellant Pierce Waste.
 Kevin T. McClain, Springfield, Ill., on the brief, for appellant.
 Jamie K. Lansford, Kansas City, Mo., argued for Covington, et al.
 Katherine L. Adams, Washington, D.C., argued, for U.S.
 Gerhardt Braeckel, Barry M. Hartman and John A. Bryson, Washington, D.C., on the briefs, for appellee.
 Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.
 BEAM, Circuit Judge.
 
 
 1
 This is an appeal from a district court judgment finding Moreco Energy, Inc. (Moreco), Pierce Waste Oil Service, Inc. (PWOS), and Jack Pierce (Pierce) jointly and severally liable under 42 U.S.C. § 9607[1] for clean-up costs of $1,024,321.79 plus prejudgment interest. 764 F.Supp. 565. Moreco, PWOS, and Pierce also appeal the court's judgment for James Covington and Mexico Feed and Seed Company (Mexico) on their 42 U.S.C. § 9613(f) cross-claim for a contribution of $36,500 to their response costs.
 
 
 2
 We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We affirm in part and reverse in part.
 
 I. BACKGROUND
 
 3
 James Covington owned a 53-acre tract in Audrain County, Missouri. He used three acres of the tract as the business offices of Mexico, of which he is president. During the mid-1960s, Jack Pierce, the president and owner of PWOS, a waste oil hauling company, approached Covington about putting some tanks on Mexico's premises. PWOS intended to store waste oil in these tanks, until enough was collected to haul to its Springfield, Illinois, processing plant. Pierce and Covington entered into an oral lease, allowing PWOS to place four tanks on a 40' by 40' parcel for $150 a year. That parcel is the focus of this litigation.
 
 
 4
 PWOS actively used the tanks until 1976. After that time PWOS stopped using them and allowed them to fall into disrepair. Rent was paid only through May, 1975. At least once after 1976, PWOS pumped one of the tanks out after Covington complained it was leaking. Neither Mexico nor Covington ever used the tanks for their own purposes nor did they accept ownership of the tanks in lieu of rent. No third party ever used the tanks, although once several people were arrested for trying to remove oil from the tanks.
 
 
 5
 During the time PWOS used the tanks, it hauled oil to the tanks from numerous clients who were later found to have PCBs[2] at their sites. PWOS never tested the oil for PCBs.[3] Oil was spilled around the tanks while PWOS trucks loaded and unloaded material. After PWOS stopped using the tanks, they developed holes which allowed rain and snow to accumulate in the tanks and oil residue to ooze out. PWOS never cleaned the sludge out of the tanks.
 
 
 6
 In the summer of 1983 Pierce sold the assets of PWOS to Moreco, a pre-existing corporation in the re-refining business with operations in several states, including one at McCook, Illinois. Moreco had sales volumes approximately five times those of PWOS. Moreco purchased PWOS's assets to strengthen its ability to collect waste oil for processing at its McCook facility. It was primarily interested in the trucks, routes, drivers, and collecting expertise PWOS had accumulated. There is no allegation that the sale was not an arm's length transaction, that the terms of the sale were unfair, or that the sale price was in any way less than the fair value of the PWOS assets Moreco received. Pierce has not yet received the full purchase price. At the time of the sale, Jack Pierce owned 90 percent of PWOS's stock. He retired from the presidency of PWOS a few months before the sale and never worked for Moreco. In February of 1984, Pierce dissolved PWOS and distributed the proceeds.
 
 
 7
 Moreco had Pierce list PWOS's assets in order to avoid acquiring hidden liabilities. PWOS's assets included oil hauling trucks and hundreds of storage tanks. The four offending tanks were not included in either the list of hard assets purchased or that of hard assets not purchased. In an inartful attempt to make sure PWOS's customer base, customer list, and goodwill were not interpreted to be excluded from the sale by the list, the list of hard assets purchased ended with a statement that the list was not exclusive. Moreco never used the tanks at issue in this case, or even knew of their existence until the EPA brought it to their attention.
 
 
 8
 Moreco ran PWOS's collection network in essentially the same manner as PWOS had run it, with many of the same employees, collection routes and trucks except it redirected the end point of the network to its McCook facility. The PWOS name was not immediately removed from the collection trucks, and it remained on receipts, insurance policies, and in state regulatory agency paperwork for a few years. Martin Pierce, Jack's son, was hired by Moreco to run the daily operations of a portion of the PWOS network. He was supervised through weekly meetings with Moreco's president. Martin Pierce was elected to Moreco's board of directors several years after the sale. There was no continuity of shareholders or directors between PWOS and Moreco at the time of the purchase.
 
 
 9
 In 1984 the EPA inspected the tanks and discovered that they contained high concentrations of PCBs. The contamination radiated out about 100 feet into the soil around the tanks, due to a process of "weathering." That degree of "weathering" indicated the initial contamination had occurred as much as 20 years earlier.
 
 
 10
 The EPA cleaned up the site, incurring response costs. The government brought suit under 42 U.S.C. § 9607 to recover its costs. It sued the Covingtons and Mexico, as owners of the site (the land); Pierce and PWOS, as owners and operators of the site (the tanks); and finally Moreco, as the corporate successor to PWOS.
 
 
 11
 The Covingtons and Mexico settled with the government during the pendency of this litigation and filed a cross-claim against Pierce, PWOS, and Moreco for the amount they personally paid the government ($20,000) and for the legal fees they had incurred due to the placement of PCBs on their property.II. DISCUSSION
 
 
 12
 The parties raise diverse issues on appeal. Pierce and PWOS argue that the district court erred in finding that they placed the PCBs in the tanks. Moreco argues that due to the government's unexcusable mistake of fact, it was improperly substituted as a party defendant to this litigation; that 42 U.S.C. § 9607 does not apply to corporate successors; and, that even if it does, Moreco cannot properly be found to be PWOS's successor. Moreco also argues that it did not receive a fair trial. Pierce, PWOS, and Moreco all argue that Covington and Mexico could not be awarded any legal costs on their cross-claim under 42 U.S.C. § 9613(f).
 
 A. Pierce and PWOS
 
 13
 Pierce and PWOS argue that the district court's finding of fact that they owned and operated the tanks at the time of the contamination was clearly erroneous, and thus they cannot be responsible parties under 42 U.S.C. § 9607.[4] After reviewing the record, we find this argument untenable. The evidence is overwhelming that PWOS hauled oil from many clients who were generating PCB contaminated oil, that PWOS stored oil in the tanks in question, that no one else used the tanks in question, and that the tanks and surrounding soil were highly contaminated with PCBs.
 
 
 14
 Pierce, as the president, and active manager of PWOS, does not and could not dispute that he is a responsible party for CERCLA purposes. United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, 743-44 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).
 
 
 15
 Both Pierce and PWOS argue that they were ignorant of any PCB contamination of the oil they hauled. That very well may be true, but is irrelevant as far as CERCLA is concerned. CERCLA is a remedial strict liability statute. As such, its focus is on responsibility, not culpability. Once a person is determined to be a covered person under section 9607(a), the only relevant defenses are those listed in 42 U.S.C. § 9607(b). Ignorance or the lawfulness of the acts of persons causing the contamination are simply not available defenses according to the plain language of this statute.[5]
 
 B. Moreco
 1. Procedural Questions
 
 16
 First, Moreco complains that, at the last minute, it was improperly substituted as a party defendant. The EPA initially brought this CERCLA suit against Motor Oils Refining Technology Corporation (MORTC), a shell through which the PWOS assets passed to Moreco. The EPA had in its possession at that time the asset purchase agreement between PWOS, Pierce, and Moreco. The asset purchase agreement was the basis of Moreco's dismissal from a July 1984 Toxic Substances Control Act proceeding the EPA had initiated involving this same site.[6] The asset purchase agreement clearly notes that the assets are to pass directly through MORTC to Moreco. Further, two depositions the EPA took in 1989 plainly state that the assets were sold to Moreco. Moreco's Appendix pp. 92 & 108. Therefore, contrary to the EPA's brief, any confusion about which corporation was the proper party to sue was largely due to governmental misconception rather than obfuscation on the part of Moreco.
 
 
 17
 A district court may, however, in its discretion, allow amendments to pleadings even after unexcusable delay if there is no prejudice to the other party. Fed.R.Civ.P. 15. See, e.g. H.L. Hayden Co. v. Siemens Medical Sys., Inc., 112 F.R.D. 417, 419, 421 (S.D.N.Y.1986). In order for an amendment substituting one party for another to relate back to the original filing of the pleadings, the substituted party must have received such notice of the institution of the action that no prejudice results and the substituted party must have known that but for a mistake, it would have been a named party to the suit in question. Fed.R.Civ.P. 15(c).
 
 
 18
 Moreco and MORTC were intimately connected. They were represented by the same counsel. Moreco knew that the government was pursuing a theory of successor liability against MORTC, and also knew that the PWOS assets had passed directly through MORTC to Moreco. Moreco therefore knew that it faced substantial liability if MORTC was found to be PWOS's successor. Just as the government should have known that Moreco was the proper party to sue, so Moreco must have known that but for the government's mistake it, and not MORTC, would have been a named defendant. Moreco had ample notice of the suit and ample incentive and time to prepare a defense. Moreco's counsel responded to the government's discovery requests and interrogatories to MORTC. The government timely sent counsel exhibits and witness lists while it was under the misapprehension that MORTC was the proper party to sue. If Moreco's counsel failed to prepare a defense for either MORTC or Moreco, and, chose instead to rely on a hoped for dismissal based on procedural arguments, any fault lies with counsel and not the court.
 
 
 19
 Second, Moreco complains that the government failed to produce evidence of the underlying contamination at the hearing dealing with the successor liability of Moreco. That Pierce and PWOS were responsible for the PCB contamination at the Mexico site was vigorously litigated at a previous phase of the trial, of which Moreco and its counsel had notice, in which Moreco was a named defendant, and in which they chose not to participate. Moreco was given a full and fair opportunity to be heard and to contest the evidence against Pierce and PWOS. Its refusal to capitalize on that opportunity can hardly implicate due process concerns, especially since Pierce and PWOS well represented Moreco's and their own interests. If anything, Moreco's failure to appear prejudiced the EPA, partially defeating the purpose of the previous consolidation of the primary liability case against Mexico and Pierce/PWOS with that of the successor liability case against Moreco.
 
 
 20
 We will not allow Moreco to further clog the federal court docket by requiring the government to prove a second time what they have already amply established, that is that Pierce and PWOS contaminated the Mexico site with PCBs.
 
 
 21
 And third, Moreco complains it was prejudiced by a waiver of the district court's local rules. For the reasons stated by the district court, we affirm the district court's decision that Moreco was not prejudiced by any waiver of, or failure of the government to abide by, the court's local rules.
 
 2. Successor Liability
 
 22
 Moreco's ultimate liability depends on the resolution of a series of legal issues. The first is whether corporate successors are covered persons for the purposes of 42 U.S.C. § 9607. The second is whether the mere continuation or the broader "substantial continuity" theory will suffice to establish corporate successorship for CERCLA purposes. If so, the third issue is whether the facts, as the district court found them, are legally sufficient to find that Moreco was a corporate successor of Pierce's PWOS.
 
 
 23
 i) CERCLA and Corporate Successors
 
 
 24
 First we will consider whether corporate successors are within the plain meaning of "corporation" as used in CERCLA. In case of ambiguity, or to double check our plain meaning interpretation, we will look to CERCLA's purpose to ensure we are giving the language of the statute the meaning its drafters most likely intended to convey.
 
 
 25
 CERCLA extends liability for clean-ups to the "covered persons" listed in 42 U.S.C. § 9607. Section 9607 details which "persons" are "covered" and which "persons" are not. Section 9601(21) defines "person." " '[P]erson' means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity...." 42 U.S.C. § 9601(21). Section 5 of 1 U.S.C. informs us that when "company" or "association" are used in reference to a corporation, they shall be deemed to include successors and assigns.[7] By implication, then, Congress must have considered the word "corporation" to inherently include corporate successors.
 
 
 26
 This interpretation of the word corporation is further supported by the doctrine of corporate successor liability, which was settled law even in the time of Blackstone. Anspec Co. v. Johnson Controls, Inc., 922 F.2d 1240, 1246 (6th Cir.1991) (citing 1 W. Blackstone, Commentaries, 467-69). In fact, corporate successor liability is so much part and parcel of corporate doctrine, it could be argued that Congress would have to explicitly exclude successor corporations if it intended its use of a legal term of art, "corporation," not to include established conceptions of the extent, life span, and path of corporate liabilities.[8]
 
 
 27
 An examination of the context in which Congress used the word "corporation" confirms our determination that corporate successors are plainly within the meaning of "person" in 42 U.S.C. § 9607. CERCLA is a remedial environmental statute with two essential purposes: 1) to provide swift and effective response to hazardous waste sites; and 2) to place the cost of that response on those responsible for creating or maintaining the hazardous condition. Anspec, 922 F.2d at 1247; see Smith Land & Improvement Corp. v. Celotex, 851 F.2d 86, 92 (3d Cir.1988), cert. denied, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). When including corporations within that set of entities which must bear the cost of cleaning up the hazardous conditions they have created, Congress could not have intended that those corporations be enabled to evade their responsibility by dying paper deaths, only to rise phoenix-like from the ashes, transformed, but free of their former liabilities. It would serve little purpose to include corporations responsible for hazardous waste sites, but not their corporate successors, within the class of "covered persons." Even in cases of good faith, a bona-fide successor reaps the economic benefits of its predecessor's use of hazardous disposal methods, and, as the recipient of the benefits, is also responsible for the costs of those benefits. Thus, a review of the purpose of CERCLA further reinforces our initial determination that successor corporations are subsumed within the plain meaning of the term "corporation."
 
 
 28
 We are therefore disposed to find that our colleagues in the Third, Sixth, and Ninth Circuits correctly held that successor corporations are within the meaning of "persons" for the purposes of CERCLA liability. Anspec, 922 F.2d at 1240; Louisiana-Pacific Corp. v. Asarco, Inc., 909 F.2d 1260 (9th Cir.1990); Smith Land, 851 F.2d at 86.
 
 
 29
 ii) Mere Continuations as Corporate Successors
 
 
 30
 The purpose of corporate successor liability, as indicated, is to prevent corporations from evading their liabilities through changes of ownership when there is a buy out or merger. Anspec, 922 F.2d at 1246. Likewise, exceptions to the traditional rule that mere asset purchasers are not liable as successors developed to prevent corporate evasions of debt through transactional technicalities. An asset purchaser will be considered as a corporate successor when one of the following applies:
 
 
 31
 (1) The purchasing corporation expressly or impliedly agrees to assume the liability;
 
 
 32
 (2) The transaction amounts to a "de facto" consolidation or merger;
 
 
 33
 (3) The purchasing corporation is merely a continuation of the selling corporation; or
 
 
 34
 (4) The transaction was fraudulently entered into in order to escape liability.
 
 
 35
 Asarco, 909 F.2d at 1263.[9] Because corporate successors are within CERCLA's ambit of liability, CERCLA must also incorporate the traditional doctrines developed to prevent corporate successors from adroitly slipping off the hook. Any other result would thwart CERCLA's essential purpose of holding responsible parties liable for clean up costs. Anspec, 922 F.2d at 1240; Asarco, 909 F.2d at 1260; Smith Land, 851 F.2d at 86.
 
 
 36
 Moreco, however, was not found to be a successor to PWOS under the traditional "mere continuation" theory, which emphasizes an "identity of officers, directors, and stock between the selling and purchasing corporations." Tucker v. Paxson Machine Co., 645 F.2d 620, 626 (8th Cir.1981). The district court applied a broadened test of successorship, "substantial continuity," which has evolved from the "mere continuation" test in contexts where the public policy vindicated by recovery from the implicated assets is paramount to that supported by the traditional rules delimiting successor liability. The test has been used in the context of labor relations, product liability, and federal environmental regulation. See United States v. Distler, 741 F.Supp. 637 (W.D.Ky.1990).
 
 
 37
 The "substantial continuity" test originated with a line of Supreme Court labor relations cases, the germinal case being Golden State Bottling Co. v. NLRB, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). The Court extended traditional doctrines to further the public policy behind the labor act, while maintaining the public policy of fairness to all parties. It held that a "bona fide purchaser, acquiring, with knowledge that the wrong remains unremedied, the employing enterprise which was the locus of the unfair labor practice, may be considered in privity with its predecessor for purposes of [unfair labor practices]." Id. at 180, 94 S.Ct. at 423 (emphasis added). The Court then briefly outlined what has come to be known as the "substantial continuation" or "continuity of enterprise" test, noting that the "substantial continuation" purchaser's knowledge of pending wrongs unremedied made broadening the net of liability fair.[10] Id. at 182-85, 94 S.Ct. at 424-26. The factor of knowledge or notice ensured that "substantial continuation" corporations not only would be able to protect themselves through purchase price adjustments or satisfactory indemnity provisions, but would be in some way responsible for the unfair labor practice remedied. See id. at 185, 94 S.Ct. at 425.
 
 
 38
 Likewise, in the context of product liability,[11] the factors of knowledge and responsibility have been present when "substantial continuation" liability has been imposed on an asset purchaser. In Mozingo v. Correct Mfg. Corp., 752 F.2d 168 (5th Cir.1985), to which the government refers, the asset purchaser was not a completely independent corporation, but a corporation formed by the selling corporation and Way, the seller's director and recent controlling stockholder. Way also became the purchaser's president and outright owner. Therefore, the purchaser was well aware of and closely tied to the seller's defective products; no liability was imposed without responsibility. Id. at 173, 176. The strong nexus between the seller's defective product and the purchasing corporation justified imposing the wider net of "substantial continuation" liability on the asset purchaser, and, but for the "substantial continuation" test, responsible parties would have evaded liability.
 
 
 39
 As we again point out, CERCLA is aimed at imposing clean up costs on the parties responsible for the creation or maintenance of hazardous waste sites. Therefore, in the CERCLA context, the imposition of successor liability under the "substantial continuation" test is justified by a showing that in substance, if not in form, the successor is a responsible party. The cases imposing "substantial continuation" successorship have correctly focused on preventing those responsible for the wastes from evading liability through the structure of subsequent transactions.
 
 
 40
 For example, in Distler, 741 F.Supp. at 637, three top employees incorporated to buy out their corporate employer. Although none of them had previously held their employer's stock, they, as general manager, general sales manager, and plant manager, essentially ran the business. They had no other business or employment either before or after the transaction. They were well aware of their former employer's practices. Although the corporation remained unchanged in everything but ownership, the traditional test would not have considered it a corporate successor. Thus, had the court not found a "substantial continuation," those responsible for hazardous waste would have escaped liability, and the purposes of CERCLA would have been thwarted.
 
 
 41
 In United States v. Carolina Transformer Co., 739 F.Supp. 1030 (E.D.N.C.1989), aff'd, 978 F.2d 832, 838 (4th Cir.1992), CERCLA successor liability was likewise imposed under the "substantial continuation" theory. There, the children of the owner of the selling corporation owned the purchasing corporation. The father also controlled the purchasing corporation, and could write checks on the purchaser's corporate account. There was no colorable question of the purchaser's knowledge of and benefit from the seller's conduct for which CERCLA liability attached, or of the seller's and purchaser's practical identity. Under the traditional tests, since these two corporations were technically owned by different parties, the purchaser could have evaded CERCLA liability and again the purpose of the statute would have been thwarted.
 
 
 42
 In Asarco, 909 F.2d at 1265-66, the Ninth Circuit refused to apply the "substantial continuity" test for successorship to a corporate asset purchaser for purposes of CERCLA liability. It found the test inapplicable because the purchaser had no actual notice of the seller's potential CERCLA liability, as the seller had not yet been identified as a potentially responsible party, and because the seller's offending installation had ceased operating nine months before the asset sale.
 
 
 43
 The other cases to which we are referred[12] deal with either the abstract principle of successor liability under CERCLA, traditional corporate successors, or "substantial continuity" as a permissible legal theory or question of fact in the context of summary judgments. See, Anspec, 922 F.2d at 1240; Smith Land, 851 F.2d at 86; United States v. Western Processing Co., 751 F.Supp. 902 (W.D.Wash.1990). While they do not shed light on our fact specific problem, these cases correctly urge that corporate successor liability be imposed in such a way to further CERCLA's essential purpose of holding responsible parties liable. See Anspec, 922 F.2d at 1247.
 
 
 44
 The issue is, whether, under these facts and in view of the development of the case law after Golden State Bottling, we can hold Moreco a responsible party, liable as a "substantial continuation" successor to PWOS, for the purposes of CERCLA[13].
 
 
 45
 In contrast to the facts discussed in Distler and Carolina Transformer, Moreco does not consist merely of PWOS's former assets. It is a larger, pre-existing corporation, which bought PWOS's assets in an arm's-length transaction in order to service one of its several re-refineries. It had been a competitor of PWOS. The PWOS network was of interest to Moreco because the network could funnel oil to an under-supplied Moreco installation. Moreco used PWOS's trucks and tanks to supply that installation. Thus, the trucking network could not render Moreco itself a mere continuation of PWOS.
 
 
 46
 In addition, as in Asarco, Moreco had no actual notice. It had no knowledge of the offending tanks nor had PWOS been identified as a potentially responsible party for CERCLA purposes in regard to the tanks. Unlike Distler and Carolina Transformer, the asset purchase transaction was between two competitors, not a cozy deal where responsible parties merely changed the form of ownership yet in substance remained the same, nor one where the actual managers of a corporation took over its ownership with full knowledge of its past practices. Nor is this a case where a purchasing corporation either in collusion with the seller, or independently, bought only "clean" assets, and knowingly left "dirty" assets behind with an insufficient asset pool to cover any potential liability.[14] Nor is this a case of willful blindness. This is a case where a seller's "dirty" assets were not disclosed, where no amount of inspection could alert the purchaser to the "dirty" assets and thus enable it to adjust its price. See Golden State Bottling, 414 U.S. at 185, 94 S.Ct. at 425. Here, like in Asarco, the seller stopped using the "dirty" assets well before the sale. The government itself has previously admitted that Moreco did not buy or know of the dirty tanks, and thus could not have known that its asset purchase might affect the government's ability to have the responsible parties pay the clean-up costs.
 
 
 47
 There is no allegation that Moreco did not give Pierce and PWOS adequate consideration for the assets it did buy. Moreco still owes Pierce $300,000, which, of course, the government may collect under its judgment against Pierce. The PWOS corporate veil was effectively, if not technically, pierced when Pierce, PWOS's owner, was held jointly and severally liable for both his own and PWOS's actions. See Northeastern Pharmaceutical, 810 F.2d at 743-44. Therefore, the very concern animating the doctrine of corporate successor liability--that the corporate veil thwart plaintiffs in actions against corporations which have sold their assets and distributed the proceeds--is not present.
 
 
 48
 The only evidence that the government presented against Moreco was that the PWOS network suited its needs, Moreco was slow in getting PWOS's name off the assets it purchased, and that because it had shopped well, Moreco was not obligated to change much of the PWOS network in order to supply its re-refinery. This does not amount to a "substantial continuation" for the purpose of holding Moreco responsible and liable under CERCLA.
 
 C. Contribution
 
 49
 We next examine 42 U.S.C. § 9613(f) to determine the extent, if any, to which Pierce and PWOS are liable to Covington or Mexico for contribution.[15] That section, in pertinent part, enables:
 
 
 50
 [a]ny person [to] seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 or this title or under section 9607(a) of this title.
 
 
 51
 42 U.S.C. § 9613(f).
 
 
 52
 Pierce objects to the district court's award because it includes some of the legal fees Covington and Mexico incurred due to the CERCLA action. The plain language of the statute does not bar the inclusion of legal fees in a contribution award. However, normally attorney's fees are not awarded, absent clear statutory authority or unusual circumstances. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 249-50, 95 S.Ct. 1612, 1617-18, 44 L.Ed.2d 141 (1975). Attorney fees have been awarded to private parties bringing 42 U.S.C. § 9607 cost recovery actions, as a necessary response cost. General Elec. Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415, 1422 (8th Cir.1990) (the reasoning in Litton is very persuasive, and is applicable to the case at hand), cert. denied, --- U.S. ----, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991). Just as attorney fees are a necessary cost for private response actions, so they are a necessary cost to parties pursued by the government under section 9607. Section 9613(f) authorizes contribution between parties liable under section 9607. Such contribution is not helpful to the less responsible party if it does not encompass a substantial portion of the financial burden imposed by the more responsible party's hazardous conduct. Therefore, section 9613 must be read to include all of a party's incurred costs. Legal fees are indisputably one of those costs.
 
 
 53
 But for their settlement with the government, Covington and Mexico would inevitably have been found to be owners and operators of the hazardous site. Therefore, we consider Weyerhaeuser Co. v. Koppers Co., 771 F.Supp. 1420 (D.Md.1991), to which the parties refer us. In that case, two jointly and severally liable parties sued each other for attorney fees as recoverable response costs. Since both parties were jointly and severally liable under section 9607, the court treated the action as one for contribution under section 9613(f). Pierce points to Weyerhaeuser's ultimate refusal to award attorney's fees to either party. However, the Weyerhaeuser court specifically noted its refusal to award either party any part of their legal costs was based on equitable reasons, not a lack of authority to do so. Id. at 1427.
 
 
 54
 The factors the Weyerhaeuser court considered were the benefits the landlord received from the operation resulting in the contamination, the landlord's knowledge of the dangers of the operation and acquiescence to those dangers, the relationship between the parties, their relative degree of fault, and their relative equality. Id. at 1423, 1427.
 
 
 55
 While arguably Covington was not an innocent and unsuspecting landlord, he was hardly in the waste oil hauling business. He had no close relationship with PWOS, and was, if anything, very unhappy with its operations. He benefited very little from the placement of the tanks on his land, and put no oil in them. He had tried to have the tanks removed. Therefore, we cannot say that the court below abused its equitable powers by including a portion of Covington's and Mexico's legal costs in its contribution award under section 42 U.S.C. § 9613.
 
 III. CONCLUSION
 
 56
 For the reasons stated above, we affirm the judgment against Pierce and PWOS, reverse the judgment against Moreco, affirm the contribution judgment against Pierce and PWOS, and reverse the contribution judgment against Moreco.
 
 
 
 [1]
 42 U.S.C. §§ 9601 through 9675 are the codification of the Comprehensive Environmental Response, Compensation, and Liability Act, otherwise known as CERCLA
 
 
 [2]
 PCBs are listed as hazardous substances under 40 C.F.R. pt. 761
 
 
 [3]
 This is not to say that PWOS was derelict in not testing for PCBs. It might not have been a recommended or even a possible practice at the time. We simply note that PWOS cannot establish that the oil it hauled was PCB free
 
 
 [4]
 42 U.S.C. § 9607(a) defines responsible party as:
 (1) the owner and operator of a vessel or a facility,
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
 (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ...; and
 (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, ... or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
 (A) all costs of removal or remedial action incurred by [official agencies] not inconsistent with the national contingency plan;
 (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.
 
 
 [5]
 "Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section...." 42 U.S.C. § 9607(a) (emphasis added). We realize this can and does lead to harsh results, but we are obliged to enforce the law as Congress has written it, unless, of course, such law violates some provision of the Constitution
 
 
 [6]
 The Toxic Substances Control Act (TSCA) 15 U.S.C. § 2605(e) violation involved a different basis for liability than this CERCLA action. There, the EPA moved to dismiss Moreco from the action based on the purchase agreement. The ALJ granted that motion because it agreed with the EPA's assertion that "Moreco never knew of or purchased storage tanks located on the property of Mexico Feed and Seed Company, Inc., Mexico, Missouri." Moreco's Appendix at 201
 Whether or not Moreco actually purchased the tanks is not controlling as to whether it is liable under CERCLA as a successor to PWOS's liabilities. The government attempts to argue in its brief that, should we find Moreco was not PWOS's successor, Moreco could also be held liable as the owner of the tanks. However the trial below was limited to the issue of Moreco's liability as a successor to PWOS. We decline the government's invitation to consider a basis of liability belatedly raised on appeal and not litigated below, noting that the government has in prior proceedings determined Moreco did not purchase the tanks, basing its conclusion on the same purchase agreement by which it now argues Moreco purchased the tanks. While general language of the type the government would like to rely on is usually found to apply to the specific language it follows (here hard assets), where there is evidence as to what the parties to a contract intended by the general language, we will not construe it in a manner contrary to their evident interests at the time of contract. See Interstate Steel Co. v. Ramm Manufacturing Corp., 108 Ill.App.3d 404, 64 Ill.Dec. 62, 438 N.E.2d 1381, 1383 (1982). There is ample evidence that Moreco intended to limit its purchase of tangible goods to the listed assets, fearing hidden liabilities. Therefore, even if we were to consider the government's belated arguments, we would reject them on the merits.
 
 
 [7]
 This statute, 1 U.S.C. §§ 1-6, provides general rules of construction for those attempting to interpret Acts of Congress
 
 
 [8]
 "[T]he drafters of CERCLA were not blind to the universal rule the 'corporation' includes a successor corporation resulting from a merger and ... the drafters intended 'corporation' to be given its usual meaning." Anspec, 922 F.2d at 1246
 
 
 [9]
 The issue of whether federal or state law should be used in analyzing successor liability was not raised by the parties and we do not decide it. However, considering the national application of CERCLA and fairness to similarly situated parties, the district court was probably correct in applying federal law. Asarco, 909 F.2d at 1263; Smith Land, 851 F.2d at 91. Contra Anspec, 922 F.2d at 1248
 
 
 [10]
 The test considers an identity of stock, stockholders, and officers, but not determinatively. It also considers whether the purchaser retained the same facilities, same employees, same name, same production facilities in the same location, same supervisory personnel; and produced the same product; maintained a continuity in assets; continued the same general business operations; and held itself out to the public as a continuation of the previous enterprise. United States v. Distler, 741 F.Supp. 637, 642-43 (W.D.Ky 1990) (citing Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 175 (5th Cir.1985))
 
 
 [11]
 The court below did not apply the "product line" exception which has been used by a few state courts in product liability situations, and nor did the government ask it to. We therefore do not address that exception to traditional successor corporate liability rules
 
 
 [12]
 Oner II, Inc. v. U.S.E.P.A., 597 F.2d 184 (9th Cir.1979), a FIFRA case imposing successor liability using the "substantial continuation" test, involved a successor corporation with actual notice of the pending action against its predecessor at the time of the asset purchase. It therefore sheds no light on our present situation, where the alleged successor neither knew of, purchased, nor used the assets in issue
 
 
 [13]
 We review the district court's application of the law to the facts de novo, despite the government's contrary assertion. Whether a corporation is a "substantial continuation" of another is a legal, not a factual, question
 
 
 [14]
 Such a case would be covered by the fourth traditional exception to nonliability for asset purchasers, that for asset transactions fraudulently entered into for the purpose of evading liability
 
 
 [15]
 Since Moreco is not a successor to PWOS, it, of course, is not liable to Covington or Mexico for contribution