The **EKOTEK SITE PRP COMMITTEE,**
**Plaintiff,**

v.

**Steven M. SELF, et al., Defendants.**

**No. 94–277L.**

United States District Court,
D. Utah.

Sept. 27, 1996.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff brings this action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (1994), for contribution towards expenses incurred in the clean-up of the Ekotek site. The general facts related to the action are detailed in the March 24, 1995 Memorandum and Order of Judge Kelly, to whom this case was previously assigned. *See Ekotek Site PRP Comm. v. Self (Ekotek I)*, 881 F.Supp. 1516 (D.Utah 1995). The matter is presently before the court on motions by defendant Fuel Processors, Inc. (FP) for summary judgment (Doc. # 790) and to strike portions of certain documents (Doc. # 857), and a motion by defendant Service First Barrel and Drum (Service First) for summary judgment (Doc. # 800). For the reasons set forth below, the court rules that (1) FP's motion for summary judgment is denied; (2) FP's motion to strike is denied; and (3) Service First's motion for summary judgment is granted.

## I. Summary Judgment Standard

When considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 536 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed. R.Civ.P. 1).

## II. Fuel Processors, Inc.'s Motions

By Memorandum and Order filed March 6, 1996, the court denied plaintiff's motion for summary judgment against FP, concluding that FP had raised issues of material fact as to whether FP had sold a useful product to Ekotek and whether FP intended to dispose of hazardous substances in its transactions with Ekotek. *Ekotek Site PRP Comm. v. Self (Ekotek II)*, 932 F.Supp. 1328, 1334–36 (D.Utah 1996). The same two issues arise in FP's present motion for summary judgment.

Judge Kelly considered the useful product defense in *Ekotek I.* Under this defense,[1] a product taken to a site is not "waste" as required under CERCLA if it "is still fit to perform the function for which it was created." *Ekotek I*, 881 F.Supp. at 1526; *see* 42 U.S.C. §§ 9607(a)(3) (liability for person arranging for "disposal"), 9601(29) (defining "disposal" as having same meaning as in Solid Waste Disposal Act (SWDA)), 6903(3) (defining "disposal" in SWDA as disposal of "hazardous waste"). Judge Kelly ruled that used motor oil conveyed to the site did not qualify as a "useful product," but he did not address the used transformer oil transported to Ekotek from FP. *Id.*

In *Ekotek II*, the court ruled that FP had raised an issue of material fact as to whether the transformer oil was a "useful product." *Ekotek II*, 932 F.Supp. at 1334–35. The court concluded:

In contrast, FP has presented facts that Ekotek approached it in 1986 and requested clean usable oil product that could be used as base stock to manufacture automatic transmission fluid. FP sold Ekotek used mineral [transformer] oil that had been filtered prior to sale. FP conducted this process to produce a new product that has as its original purpose being a base stock for a manufacturing operation. Judge Kelly rejected "the proposition that merely because a valuable substance could, through processing, be reclaimed from an otherwise useless product, that the otherwise useless product was 'new and useful' such that CERCLA liability would not attach." [*Ekotek I*, 881 F.Supp.] at 1526. When viewed in the light most favorable to FP, however, the evidence indicates that the product sold by FP was not otherwise useless absent some further processing; it had already been processed and the valuable substance had already been reclaimed prior to sale. The record raises the inference that oil like that sold to Ekotek can be used as hydraulic fluid, transformer oil, and fuel, apparently without further processing.

*Ekotek II*, 932 F.Supp. at 1334–35.

The court also considered FP's intent argument in *Ekotek II.* The court concluded that the Tenth Circuit would require intentional action before arranger liability attaches and that therefore the mere sale of a product, by itself, does not constitute "arranging for disposal" under CERCLA. *Id.* at 1336. The court also ruled that "dispose" is used in its ordinary sense in this context and that "in order to hold a person responsible for arranger liability, the person must have intended to get rid of its hazardous wastes." *Id.* The court concluded that plaintiff was not entitled to summary judgment on this issue:

Plaintiff has the burden of proving that FP intended to get rid of its hazardous substances. Such a burden is not onerous. For example, if the evidence were to show that the only basis for selling used oil to Ekotek was for that oil to be recycled, that circumstantial evidence would appear suffi-

---

1. FP carries the burden of proof as to this defense.

cient to establish the requisite intent, *i.e.*, such evidence would show that the purpose of the transaction was to get rid of hazardous substances.

Although the burden of proving intent is not onerous, FP's admissions do not suffice to carry that burden. FP has merely admitted that it sold used mineral oil to Ekotek. Without more, that admission does not establish an intent to get rid of hazardous substances. "If a party merely sells a product, without additional evidence that the transaction includes an 'arrangement' for the ultimate disposal of a hazardous substance, CERCLA liability would not be imposed." Plaintiff has offered no additional evidence in support of its motion. Therefore, for this reason as well, the court denies summary judgment as to FP.

*Id.* (citation omitted).

■ In moving for summary judgment itself, FP again asserts that it sold a useful product to Ekotek and that it did not intend to get rid of hazardous substances. The two issues are intertwined in the present context. FP has submitted evidence that it takes used transformer oil from generators, that it recycles that oil, that Ekotek approached it to purchase recycled oil to use as base stock for automatic transmission fluid, that the parties agreed to a price of 11 cents per gallon, and that Ekotek paid to transport the recycled oil to the site. FP argues therefore that it sold a *new* product to Ekotek and that it intended to *sell* that product, not get rid of used transformer oil. FP asserts that plaintiff has established only a sale of a product containing hazardous substances and that such evidence is not sufficient to show intent and overcome the useful product defense.

In opposition to FP's motion for summary judgment, plaintiff contends that FP did not provide Ekotek a useful product, but rather one that required further processing. Plain-

tiff also contends that FP intended to give away the used transformer oil, acting essentially as a go-between for generators who needed to dispose of used oil containing hazardous substances. In support of these arguments, the plaintiff offers laboratory reports and site record evidence and also relies on evidence dealing with the price of the product which FP sold to Ekotek. It is this latter evidence, concerning price, which forms the basis for the court's conclusion that the plaintiff has established that there are questions of material fact for trial.

Evidence that FP sold its product to Ekotek at a price well below market price is probative of what FP was actually doing here and plaintiff has submitted such evidence.[2] Plaintiff has submitted an expert affidavit stating that "[p]ayment of $.11 per gallon for used transformer oil was well below the market price for new or used transformer oil or for [automatic transmission fluid] in 1986." As FP points out, this statement does not give an actual market price, and FP does not contend that it merely sold used transformer oil. Plaintiff also cites the deposition of FP's president, however, who stated that the price of clean, used transformer oil for use as heat transfer oil was 30 to 80 cents per gallon.

This concession, considered with the affidavit of plaintiff's expert, is sufficient to raise a question of material fact. Plaintiff has produced evidence that 11 cents per gallon is a low price, both absolutely and relative to the market. An inference may thus be drawn that the oil conveyed to Ekotek was not really different from used transformer oil and so not a useful product. The further inference may be drawn from the low price that FP intended to get rid of hazardous substances. The fact that FP charged Ekotek here is not enough to warrant summary judgment on the issue of intent, for FP could quite reasonably have intended *both* to receive income and to dispose of hazardous

---

**2.** Much of the price evidence submitted by plaintiff is actually of minimal probative value. For instance, plaintiff emphasizes that FP was given or even paid for taking used transformer oil from the generators. This does not necessarily cast doubt, however, on FP's claim that it took used oil (albeit from those who wished to dispose of it), make it into a useful product, and then sold that product for a profit. Plaintiff also notes that it normally costs anywhere from $1.64 to $9.91 per gallon to dispose of used transformer oil containing hazardous substances. Again, that information is not terribly helpful in trying to determine whether FP intended to and actually did sell a different, useful product.

waste. As the court stated in *Ekotek II*, plaintiff's burden on this issue is not onerous and it has satisfied that burden for summary judgment purposes. *Ekotek II*, 932 F.Supp. at 1336.

Plaintiff points out that laboratory reports of tests conducted on material at FP's plant show that hazardous substances were found in the material tested. Plaintiff also notes that bottoms, solids, and wastes (BS & W) was found in some of the tested oil which was "incoming" to FP, and defendant argues that such oil would require further processing before it could have been used. While the evidence contained in the lab reports might not by itself establish that issues of material fact remain, it does support the plaintiff's basic theory.[3]

Plaintiff has also submitted records from the site in opposition to FP's motion. Invoices indicate that Ekotek received shipments from FP on three occasions in 1986. With respect to the first occasion, the invoice contains the notations "Transformer Oil" and "Keep Clean", and the invoice indicates a price of 11 cents per gallon. The other two invoices contain the notations "Transformer Oil", "BS & W", and "N/C". A document from the shipping company that corresponds to one of these latter invoices contains the following hand-written statement: "This is a 'freebie' oil as it was dirty & murky. Shipper agreed for us to release at no charge."[4] Plaintiff thus argues that questions of fact are raised as to whether the oil sent from FP was still dirty (and thus not a useful product) and whether some of the oil was given to Ekotek at no charge (thus furthering an intent to get rid of hazardous substances).

FP has moved to strike these site records, which were attached to an affidavit by plaintiff's attorney. FP argues that the court may not consider the records because the attorney has no personal knowledge that the records were kept in the ordinary course of Ekotek's business. While this argument seems persuasive, the court need not decide the issue at this time because it concludes that plaintiff's evidence regarding FP's price is sufficient in itself to preclude summary judgment.[5]

Plaintiff's evidence in support of its position is not overwhelming. Nonetheless, when the evidence is considered in the light most favorable to plaintiff, that evidence is sufficient to raise issues of material fact and summary judgment is therefore inappropriate. FP's motion for summary judgment is denied.

## III. Service First's Motion for Summary Judgment

### A. Facts [6]

Stanco Enterprises, L.C. (Stanco) does business as Service First, the named defendant here. On March 31, 1992, Stanco entered into a Contract for Purchase of Property with Beehive Barrel and Drum, Inc. (Beehive). For consideration totaling $500,-000, Stanco purchased Beehive's "business and assets as a going concern." The assets conveyed included five parcels of land, other tangible property, and all intangible property, including good will, going concern value, customer lists, and use of the Beehive name.

---

3. FP has moved to strike the reports and certain conclusions drawn from them by plaintiff's expert in an affidavit. FP argues that, because the oil tested could not have been the same oil transported to Ekotek, the analysis of that oil is irrelevant. However, because FP had represented to the EPA that the oil tested was representative of the oil *sent* to Ekotek, the court believes an inference could be drawn that the oil which was sent also contained these substances. Thus, FP's motion to strike is overruled.

4. This shipping document refers to "fuel oil". Relying on this document, plaintiff claims that something other than transformer oil was transported from FP to Ekotek, giving rise to an independent basis for liability. The corresponding Ekotek invoice, however, refers to "Transformer Oil", and FP has submitted evidence that transformer oil is a type of fuel oil. Accordingly, plaintiff has not established a material question of fact regarding whether anything other than transformer oil was conveyed from FP to the site.

5. Accordingly, FP's motion to strike with respect to these documents is denied as moot. However, the court stresses that plaintiff would have to establish a proper basis to introduce the records as evidence at trial if plaintiff desires the court to consider those records.

6. The facts are uncontroverted or stated in the light most favorable to plaintiff.

Beehive assigned its insurance policies to Stanco and agreed to a covenant not to compete, which bound Beehive and its shareholders for five years.

Beehive agreed to convey the land and improvements free and clear of all claims or obligations arising under environmental laws, encumbrances, and restrictions, except for certain trust deeds, ordinary easements, and zoning regulations. Beehive also convenanted that it had not committed acts that would give rise to liability under CERCLA. Finally, Beehive agreed to indemnify Stanco for liabilities arising before the date of the contract.

Stanco was not created merely to purchase Beehive's assets; rather, Stanco or its predecessor entity had existed for twenty years at the time of the transaction. Neither Beehive nor its shareholders had ever held an interest in Stanco; nor had Stanco or its owners ever held ownership in Beehive. After the purchase of Beehive's assets, Stanco did not retain any of Beehive's supervisory employees.

From 1986 to 1988, Beehive disposed of waste oil at the Ekotek site. On March 11, 1994, plaintiff filed the instant action, which named Beehive as a defendant.

### B. Analysis

Service First argues that, as a mere asset purchaser, it should not be liable under CERCLA as a successor corporation for Beehive's acts. The first question, therefore, is whether CERCLA liability extends to successor corporations. CERCLA makes certain enumerated "persons" liable for cleanups, 42 U.S.C. § 9607, and "person" is defined within the statute to include corporations, 42 U.S.C. § 9601(21). CERCLA does not define "corporation," however.

The Tenth Circuit has not addressed successor liability under CERCLA. Each federal circuit court of appeals that has considered the question, however, has held that CERCLA does impose liability on successor corporations. *See John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 404 (1st Cir.1993); *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478, 486–87 (8th Cir.1992); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir.1992); *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245 (6th Cir.1991); *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1262 (9th Cir.1990); *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 87–92 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989).

The court finds the Eighth Circuit's analysis in *Mexico Feed* to be helpful here. That court cited section 5 of title 1 of the United States Code, which provides that "company" or "association" used in reference to a corporation "shall be deemed to include successors and assigns." *Mexico Feed*, 980 F.2d at 486; *see* 1 U.S.C. § 5 (1994). The court reasoned that, by implication, Congress must have considered the term "corporation" in CERCLA inherently to include successor corporations. *Mexico Feed*, 980 F.2d at 486; *see also Anspec*, 922 F.2d at 1247 (relying on 1 U.S.C. § 5).

The Eighth Circuit also stated that, in light of the long-standing doctrine of corporate successor liability, Congress would have explicitly excluded successor corporations if it had intended "corporation" not to include "established conceptions of the extent, life span, and path of corporate liabilities." *Id.*; *see also Anspec*, 922 F.2d at 1246 (drafters intended "corporation" to be given its traditional meaning, which includes the doctrine of corporate successor liability).

Finally, the court determined that successor liability comports with the remedial purposes of CERCLA "to provide swift and effective response to hazardous waste sites" and to place the cost of such response on those responsible for the hazardous condition. *Mexico Feed*, 980 F.2d at 486. The court stated:

When including corporations within that set of entities which must bear the cost of cleaning up the hazardous conditions they have created, Congress could not have intended that those corporations be enabled to evade their responsibility by dying paper deaths, only to rise phoenix-like from the ashes, transformed, but free of their former liabilities. It would serve little purpose to include corporations responsi-

ble for hazardous waste sites, but not their corporate successors, within the class of "covered persons." Even in cases of good faith, a bona-fide successor reaps the economic benefits of its predecessor's use of hazardous disposal methods, and, as the recipient of the benefits, is also responsible for the costs of those benefits. Thus, a review of the purpose of CERCLA further reinforces our initial determination that successor corporations are subsumed within the plain meaning of the term "corporation."

*Id.* at 487.

■ The court is persuaded by the reasoning of the Eighth Circuit that Congress intended that CERCLA apply to successor corporations, and the court is confident that the Tenth Circuit would follow its sibling circuits and so hold.

■ Under the doctrine of corporate successor liability, changes in ownership of a corporation's stock does not affect the corporation's liabilities. *Smith Land,* 851 F.2d at 91. In the case of a merger, the remaining corporation may likewise be held liable for the acts of the dissolved corporation. *Id.* Similarly, when a new corporation is formed by consolidation, it assumes the liabilities of the constituent companies. *Id.* A mere asset purchaser is not liable under CERCLA as a successor corporation, however, unless one of the following four exceptions [7] applies:

(1) The purchasing corporation expressly or impliedly agrees to assume the liability;

(2) The transaction amounts to a "de-facto" consolidation or merger;

(3) The purchasing corporation is merely a continuation of the selling corporation; or

(4) The transaction was fraudulently entered into in order to escape liability.

*Asarco,* 909 F.2d at 1263; *accord John S. Boyd Co.,* 992 F.2d at 408; *Mexico Feed,* 980 F.2d at 487; *Carolina Transformer,* 978 F.2d at 838.[8] Plaintiff argues that Service First could be liable here under any of the first three exceptions.

■ Plaintiff argues most strongly that Service First is merely a continuation of Beehive. Application of this exception generally requires an identity of shareholders, officers, and directors between the two corporations. *John S. Boyd,* 992 F.2d at 408–09; *Mexico Feed,* 980 F.2d at 487; *Carolina Transformer,* 978 F.2d at 838. Plaintiff has not shown such identity here.

Some courts have applied a more expansive version of the "mere continuity" exception known as the "substantial continuity" or "continuity of enterprise" approach. *See Mexico Feed,* 980 F.2d at 487–90; *Carolina Transformer,* 978 F.2d at 838–41; *Asarco,* 909 F.2d at 1265–66. That approach has been applied when "the public policy vindicated by recovery from the implicated assets is paramount to that supported by the traditional rules delimiting successor liability." *Mexico Feed,* 980 F.2d at 487.

■ Under the "substantial continuity" test, the court must consider a number of factors, including retention of the same employees, supervisory personnel, facilities, location, and name; production of the same product; continuity of assets; continuity of business operations; and the successor's holding itself out as a continuation of the previous enterprise. *Mexico Feed,* 980 F.2d at 488 n. 10; *Carolina Transformer,* 978

---

7. A few state courts have recognized a fifth exception, known as the "product line exception," in product liability cases; plaintiff has not asserted that this exception applies and the court declines to address it. *See Mexico Feed,* 980 F.2d at 488 n. 11; *Asarco,* 909 F.2d at 1264 n. 3.

8. The parties have not addressed the issue of whether federal or state law should be used in analyzing successor liability, although they cite almost exclusively to federal court cases. Accordingly, the court is not called upon to decide that question expressly. *See Mexico Feed,* 980

F.2d at 487 n. 9. In the absence of persuasive argument to the contrary, however, the court believes that federal law should apply, in light of the legislative history suggesting that Congress expected the courts to develop a federal common law to supplement CERCLA, the statute's national application, the need for fairness to similarly situated parties, and the possibility that CERCLA's purposes would be frustrated by state law. *See id.; Carolina Transformer,* 978 F.2d at 837–38; *Asarco,* 909 F.2d at 1263, 1263 n. 2; *Smith Land,* 851 F.2d at 91–92.

F.2d at 838; *Asarco,* 909 F.2d at 1265 n. 7. "If the transfer to the new corporation was part of an effort to continue the business of the former corporation yet avoid its existing or potential state or federal environmental liability, of course that should be considered also." *Carolina .Transformer,* 978 F.2d at 838.

In *Mexico Feed,* the court cited the additional requirement that the purchaser have knowledge or notice of the seller's potential liability under CERCLA. *Mexico Feed,* 980 F.2d at 488–89. The court noted that the Supreme Court first introduced the "substantial continuity" test in a labor relations case in order to impose· liability on purchasers who had knowledge of the unfair labor practice and were therefore responsible, at least in. part, for the wrongful conduct. *Id.* at 488 (citing *Golden State Bottling Co. v. N.L.R.B.,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973)). The Eighth Circuit further noted that in product liability cases "the factors of knowledge and responsibility have been present when 'substantial continuation' liability has been imposed on an asset purchaser." *Id.* The court concluded that a similar "responsible party" requirement was appropriate in CERCLA cases given the statute's aim in imposing clean-up costs on the parties responsible for the hazardous condition of a site. *Id.*

The *Mexico Feed* court then reviewed prior cases. In one district court case, a "substantial continuation" was found where three managers, who had essentially run the business and so were well aware of their employer's practices, bought out the employer. *Id.* (citing *United States v. Distler,* 741 F.Supp. 637 (W.D.Ky.1990)). Similarly, in *Carolina Transformer,* CERCLA successor liability was imposed where the children of the owner of the seller owned the purchaser, the parent actually controlled both corporations, and there was no question of the purchaser's knowledge of the seller's conduct. *Id.* at 488–89 (citing *United States v. Carolina Transformer,* 739 F.Supp. 1030 (E.D.N.C. 1989), *aff'd,* 978 F.2d 832 (4th Cir.1992)). The Ninth Circuit, on the other hand, refused to find "substantial continuity" where the purchaser had no notice of the seller's potential CERCLA liability. *Id.* at 489 (citing *Asarco,* 909 F.2d at 1265–66).

Finally, the Eighth Circuit held that "substantial continuity" did not exist in the case before it. *Id.* at 489–90. The court pointed to facts that the purchaser corporation did not consist merely of the seller's former assets; that the purchase was an arm's-length transaction; that the purchaser had been a ·competitor of the seller; that the purchaser had no notice or knowledge of the offending oil tanks or the seller's identification as a potentially responsible party; and that there was no allegation that the asset purchase was not supported by adequate consideration. *Id.* The court concluded:

> Unlike *Distler* and *Carolina Transformer,* the asset purchase transaction was between two competitors, not a cozy deal where responsible parties merely changed the form of ownership yet in substance remained the same, nor one where the actual managers of a corporation took over its ownership with full knowledge of its past practices. Nor is this a case where a purchasing corporation either in collusion with the seller, or independently, bought only "clean" assets, and knowingly left "dirty" assets behind with an insufficient asset pool to cover any potential liability. Nor is this a case of willful blindness.

*Id.* (footnote omitted).

In the instant action, plaintiff argues that the requisite "substantial continuity" arose from Stanco's purchase of Beehive as an ongoing business, including the right to use the Beehive name and other intangibles. Plaintiff asserts that, although Beehive did not formally dissolve, the transaction essentially left only one corporation carrying on Beehive's business as usual.

The court concludes that plaintiff has not presented evidence sufficient to show a "substantial continuity" here. As in *Mexico Feed,* plaintiff has not shown any common ownership or personnel, or that the corporations or the persons running them were in any way related or involved with one another. Plaintiff has not alleged inadequate consideration or presented evidence suggesting that the asset purchase was anything more than an arm's-length transaction between competitors. Plaintiff has not shown that Stanco had notice or knowledge of Beehive's potential CERCLA liability, or that Stanco is

in any other way a responsible party. Finally, and perhaps most importantly, there is no evidence that the business at issue was actually continued after the transaction.[9]

Plaintiff argues, in essence, that one company's buying out another is sufficient in itself to make the former liable as a successor corporation under the "substantial continuity" exception. More is required, however, and plaintiff has not presented facts evidencing an arrangement going beyond the ordinary transaction between stranger corporations. As such, the case is similar to *Mexico Feed*, and the court concludes that the Tenth Circuit would reach the same result here as the one reached by the Eighth Circuit in that case.

Plaintiff also asserts that successor liability could arise here under the de facto merger exception. Courts have recognized such mergers when

(1) there is a continuation of the enterprise of the seller in terms of continuity of management, personnel, physical location, assets, and operations;

(2) there is a continuity of shareholders;

(3) the seller ceases operations, liquidates, and dissolves as soon as legally and practically possible; and

(4) the purchasing corporation assumes the obligations of the seller necessary for uninterrupted continuation of business operations.

*Asarco*, 909 F.2d at 1264. In particular, "courts have consistently required continuity of shareholders." *Id.; accord John S. Boyd*, 992 F.2d at 408–09. Plaintiff has not shown a continuity of shareholders or satisfied the other required elements; thus, plaintiff has not raised a genuine issue of material fact as to the applicability of this exception.

■ Finally, the court rejects plaintiff's contention that Stanco impliedly agreed to assume the alleged liability. The contract, which provided that Stanco did not assume any liabilities other than those set forth explicitly therein, does not in itself give rise to the necessary inference, and plaintiff has not

identified any other circumstances that would support application of this exception.

In summary, plaintiff has not presented evidence sufficient to raise a genuine issue of material fact that one of the asset purchaser exceptions applies and that Service First may therefore be liable as a successor corporation. Accordingly, Service First is entitled to summary judgment.

**IT IS THEREFORE ORDERED THAT** the motion by Fuel Processors, Inc. for summary judgment (Doc. # 790) is denied.

**IT IS FURTHER ORDERED THAT** the motion by Fuel Processors, Inc. to strike portions of certain documents (Doc. # 857) is denied.

**IT IS FURTHER ORDERED THAT** the motion by Service First Barrel and Drum for summary judgment (Doc. # 800) is granted, and plaintiff's claims against that party are hereby dismissed.

**IT IS SO ORDERED.**

---

9. Plaintiff notes that Beehive applied to do business in Utah under that name in 1985, no filing was made to terminate that application, and Service First did not apply to do business under its name until after this action was filed in 1994.

These facts do not necessarily suggest, however, that Service First did in fact operate the business under the Beehive name, and plaintiff has not submitted any other such evidence.