**UNITED STATES of America, et al., Plaintiffs,**

v.

**David Bowen WALLACE, et al., Defendants.**

**Civil Action No. 3:93–CV–0838P.**

United States District Court, N.D. Texas, Dallas Division.

March 29, 1996.

Richard Gladstein, U.S. Dept. of Justice Environmental Defense Section, Washington, DC, Albert M. Bronson, Office of Atty. Gen. of Texas, Environmental Protection Div., Austin, TX, for Plaintiffs.

Duane Alan Siler, Patton Boggs and Blow, Washington, DC, for Defendants.

## MEMORANDUM OPINION and ORDER

SOLIS, District Judge.

The dispute in this case over reimbursement of response costs incurred in the environmental cleanup of the Bio–Ecology Site is

now before the Court on the motions and cross-motions for summary judgment filed by the parties. Defendant United Technologies Corporation filed its Motion for Summary Judgment on June 17, 1994; Plaintiffs filed their Motion for Summary Judgment as to Liability of CTU of Delaware and Cross Motion for Summary Judgment as to Liability of United Technologies on July 7, 1994; and Defendants UTC and CTU filed their Cross-Motion for Summary Judgment Against the United States and the State of Texas on July 28, 1994.

## BACKGROUND

Bio–Ecology Systems, Inc. operated a waste treatment and disposal facility at the Bio–Ecology Systems Superfund Site ("Site") in Grand Prairie, Texas, from 1972 to 1978. By agreement between the Environmental Protection Agency ("EPA") and the State of Texas ("State"), a Remedial Investigation and a Feasibility Study were performed during 1982, 1983, and 1984, documenting the presence of numerous hazardous waste substances at the Site. The release or threatened release of the hazardous substances from the Site posed a substantial hazard to the public health, welfare and the environment, warranting remedial action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, et al. ("CERCLA").

The United States of America ("United States") filed this case, pursuant to CERCLA, 42 U.S.C. § 9607, to recover costs incurred in responding to the releases or threatened releases of hazardous substances from the Site. The State also filed suit, pursuant to CERCLA, 42 U.S.C. §§ 9604 and 9607, for the recovery of costs incurred for the remedial action at the Site, which case was previously consolidated herewith. The United States and the State seek recovery from United Technologies Corporation ("UTC") and CTU of Delaware ("CTU", collectively "Defendants") as parties jointly and severally liable for contributing the hazardous substances to the Site. Some defendants filed cross-claims and counterclaims against the United States, pursuant to CERCLA, 42 U.S.C. § 9607, alleging the U.S. Air Force ("USAF"), the Drug Enforcement Agency ("DEA"), and the Small Business Administration ("SBA") were jointly and severally liable for response costs at the Site. Further, some defendants filed a third party complaint against the State, alleging the Texas Department of Agriculture ("TDA") and the University of Texas at Dallas ("UTD") were jointly and severally liable for response costs and seeking contribution under CERCLA, 42 U.S.C. § 9613(f).

## UNDISPUTED FACTS

1. The Bio–Ecology Systems, Inc. ("Bio-Ecology") operated a waste treatment and disposal facility at the eleven-acre Site, which contained an incinerator, waste lagoons, tanks containing solvents, and landfill areas containing metal and organic compounds which are hazardous under CERCLA.

2. On March 27, 1969, Mostek was incorporated under Delaware law.

3. Mostek manufactured arsenic-doped silicon semiconductor wafers at its Carrollton, Texas plant.

4. Between 1969 and 1979, Mostek became a leading United States manufacturer of semiconductors, with its principal place of business in Carrollton, Texas. During this ten-year period, Mostek operated as an independent company. As of 1979, Mostek had 1,539 common stockholders in the United States and abroad, a total of 5,962,850 shares, sales of more than $154 million, and earnings of more than $12 million.

5. Mostek Corporation ("Mostek") by contract, agreement or otherwise arranged for the treatment or disposal, or arranged with a transporter for transport for disposal or treatment of hazardous substances at the Site from at least June 1976 through September 1977. Most of the waste was dilute hydrofluoric acid that Mostek shipped to the Site via tank trucks from Bio–Ecology. During this same period Mostek shipped 32,605 gallons of spent solvents to the Site in 55-gallon drums.

6. The Remedial Investigation documented the presence of numerous hazardous substances in waste samples at the Site including, but not limited to, heavy metals (such as

lead, chromium, nickel, zinc, cadmium, arsenic, and mercury), benzene, cyanide, aromatic hydrocarbons, butyl benzyl phthalate, chlorobenzene, di-n-butyl phthalate, di-n-octyl phthalate, diethyl phthalate, 2,4 dimethylphenol, 1,2 diphenylhydrazine, ethylbenzene, fluoranthene, methylene chloride, naphthalene, phenanthrene, phenol, tetrachoroethylene, trichloroethylene, 1,1,1 trichloroethane, toluene, 1,2,3 trichlorobenzene, pentachlorophenol, and bis (2–ethylhexyl) phthalate.

7. In September 1984, EPA and the State of Texas entered into a cooperative agreement for the performance of the Remedial Design. The Remedial Design was approved in May 1986. Construction on the Remedial Action commenced on, or shortly after, May 1, 1987. The final inspection of the Remedial Action construction was conducted on August 31, 1988.

8. On July 21, 1934, United Technologies Corporation ("UTC") was incorporated under Delaware law.

9. On January 26, 1978, Speco Corporation was incorporated under Delaware law as a subsidiary of UTC. Speco changed its name on November 16, 1978, to CTU of Delaware, Inc. ("CTU").

10. UTC has been the sole shareholder of CTU from November 1978 through the present.

11. CTU of Delaware, Inc. conducted no business prior to September 1979, and was an inactive corporation prior to the acquisition of Mostek in March 1980.

12. On September 26, 1979, UTC, CTU and Mostek entered into an Agreement for Acquisition of Mostek Corporation.

13. On January 8, 1980, CTU–Sub, Inc. was incorporated under Delaware law as a wholly owned subsidiary of CTU.

14. On January 11, 1980, CTU–Sub, Inc. was merged into Mostek, the surviving corporation.

15. On or about March 28, 1980, Mostek was merged into CTU, the surviving corporation. According to the Certificate of Ownership and Merger merging Mostek into CTU, "all debts, liabilities, and obligations of Mostek [became] the debts, liabilities and obligations of CTU". CTU simultaneously changed its name to Mostek Corporation.

16. The Mostek subsidiary operated from 1980 to 1985. Mostek incurred substantial losses between 1980 and 1985.

17. On October 29, 1985, Thomson Semiconductors, Inc. ("Thomson") was incorporated under Delaware law as a subsidiary of Thomson–CSF.

18. On October 30, 1985, Thomson entered into a memorandum of understanding to acquire most of the assets of Mostek, including the name Mostek. Mostek's operations in Ireland and land and buildings in Colorado Springs, Colorado were excluded.

19. On November 13, 1985, Thomson entered into an Asset Purchase Agreement with Mostek. Pursuant to section 1.03(b) of the Agreement, CTU retained certain liabilities of Mostek, including environmental liabilities.

20. Following the sale of most of Mostek's assets to Thomson, on December 23, 1985, Mostek changed its name back to CTU of Delaware, Inc.

21. From November 1985 to October 1989, CTU's only operation was the liquidation of assets. Since approximately June 1987, CTU has not conducted any significant business operations, and since 1989, CTU has not conducted any business operations.

*SUMMARY JUDGMENT*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *Thomas v. Harris County,* 784 F.2d 648, 651 (5th Cir.1986). All evidence and the inferences to be drawn therefrom "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). At the summary judgment stage, this Court may

neither make credibility determinations nor weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990).

The party moving for summary judgment must identify the evidence on file in the case which establishes the absence of any genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has made an initial showing, the party opposing the motion must offer evidence sufficient to establish the existence of essential elements of the party's case. *Id.* at 322, 106 S.Ct. at 2552. The party opposing may not rely only on its pleadings or mere assertions that they will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987); Fed. R.Civ.P. 56(e). The non-movant must identify specific evidence in the record and articulate the "precise manner" in which that evidence supports its claim. *ContiCommodity Services, Inc. v. Ragan,* 63 F.3d 438, 441 (5th Cir. 1995) (citations omitted).

The party opposing a motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a jury may return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986). A fact is material if it will affect the outcome of the case. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975). Additionally, if the party opposing the motion fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

*DISCUSSION*

Plaintiffs claim Defendants UTC and CTU are jointly and severally liable for response costs incurred in the cleanup of the Site. Plaintiffs bear the burden establishing that:

(1) defendant is one of the four categories of covered persons listed under § 9607(a) as liable for the costs of remedial action, (2) the site of the cleanup is a facility under § 9601(9), (3) there is a release or threatened release of hazardous substances at the facility, (4) as a result of which plaintiff has incurred response costs, and (5) the costs incurred conform to the national contingency plan under § 9607(a)(4)(A) as administered by the EPA.

*United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 719–20 (2nd Cir.1993). Only the first element is disputed by Defendants UTC and CTU, therefore, the remaining elements are deemed established by Plaintiffs. If Plaintiffs further establish that Defendants fall within one of the four categories of covered persons on undisputed facts, "and the defendant is unable to demonstrate by a preponderance of the evidence the existence of one of the three affirmative defenses set forth in § 9607(b), then the plaintiff is entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to appropriate damages." *Id.* (*citing Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989)).

## I. LIABILITY OF CTU of Delaware

It is undisputed that Mostek falls within the third category of covered persons listed in section 9607(a), any person [1] who arranged for [2] disposal or treatment of hazardous substances at a facility at which such substances were disposed of. 42 U.S.C. § 9607(a). It is further undisputed that CTU assumed all debts, liabilities and obligations of Mostek upon merger. However, CTU presents three arguments as to why they should not be held jointly and severally liable.

## A. *PLAINTIFFS' ACTION SHOULD BE BARRED*

■ First, CTU argues Plaintiffs are barred from imposing joint and several liabil-

---

1. "The term 'person' means an individual, firm, corporation, association, ... United States Government, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21).

2. Persons falling within this category are frequently referred to by courts as "arrangers" or "generators", thus the terms "arranger liability" or "generator liability". Plaintiffs seek to hold UTC and CTU liable as arrangers/generators.

ity on CTU under § 9607 because Plaintiffs, as responsible parties, may only seek contribution under § 9613. Plaintiffs strenuously object to Defendants' argument that because agencies of both sovereignties sent hazardous substances to the Site the plaintiffs cannot bring an action under § 9607. The Court agrees with Plaintiffs.

None of the cases cited by Defendants support the proposition that the sovereignties may not seek to impose joint and several liability on responsible persons, as specifically provided by CERCLA, when agencies of the governments are also responsible persons liable for response costs. The Court declines Defendants' invitation to extend the holdings of their cited authority to the facts of the instant case. Plaintiffs' potential liability for contribution does not affect the governments' right to full recovery of its response costs. *See United States v. Kramer*, 757 F.Supp. 397, 414 (D.N.J.1991).

## B. MATERIAL QUESTIONS OF FACT

█ Although CERCLA imposes strict liability on persons as listed in § 9607(a), a defendant may escape *joint and several* liability for response costs if it shows (1) that its waste, when mixed with other hazardous wastes, did not contribute to the release and cleanup costs incurred, or (2) that, at most, it contributed to only a divisible portion of the harm. *Alcan*, 990 F.2d at 722; *See generally In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 897–902 (5th Cir.1993). Accordingly, as its second argument, CTU urges the Court to find summary judgment is precluded because there are substantial, material fact questions regarding whether or not Mostek's wastes contained arsenic and whether or not Mostek's dilute hydrofluoric acid waste contributed to the release and cleanup costs incurred.

### 1. Contribution

#### a. 32,605 Gallons of Spent Solvents

█ CTU does not dispute Plaintiffs' statement that the 32,605 gallons of spent solvents shipped by Mostek to the Site contained trichloroethylene, phenol, diethylbenzene, trichlorobenzene, alpha-phellandrene, napthene, trichloromethane, trimethylsilanol, syn-dimethylurea, hexamethyldisilazane, ethylcellosolve acetate, xylenol, cyclotrisiloxane, butyl acetate, siloxane, and dichlorobenzene; hazardous substances under CERCLA. The Court finds the undisputed evidence clearly establishes these hazardous substances contained in the spent solvents shipped by Mostek to the Site were released or threatened released at the facility, resulting in the incurrence of response costs.

CTU presents no argument as to why it should not be held liable for costs related to the cleanup of these hazardous substances. Accordingly, the Court finds CTU, having assumed all of the debts, liabilities and obligations of Mostek, is liable for the response costs thus incurred. However, if liability were based on only this small amount of contribution to the hazardous substances which were released or which threatened release at the Site, the Court would allow CTU to present further evidence on the issue of divisibility prior to holding CTU *jointly and severally* liable for the response costs attributed to the cleanup of the 32,605 gallons of spent solvents.

#### b. Hydrofluoric Acid Waste

##### (1) Treated

It is undisputed that Mostek sent approximately one million gallons of hydrofluoric acid ("HF") to the Site for treatment and disposal, however, Defendants argue that the HF wastes were treated so that they were harmless and, thus, did not contribute to the release or threatened release at the Site. In support of their argument, Defendants offer the testimony of Dr. William Brown that all of Mostek's HF was chemically converted to non-hazardous constituents. DEFENDANTS' EXHIBIT 2, BROWN DEPOSITION, at 35–36. Brown further stated that the dilution of the treated HF could be tested by titrating the treated HF waste with a dilute solution of reagent made calcium hydroxide and determining an input. In other words, if the treated HF waste was titrated slowly enough to show the change in pH, an end point could be derived for determining the effectiveness of the treatment. *Id.*, at 95.

Although the evidence clearly shows that Brown designed the treatment and testing process to effectively neutralize any hazardous elements contained in Mostek's HF waste, Defendants have not produced evidence which would satisfy their burden to show that Mostek's wastes did not contribute to the release and cleanup costs incurred. Brown stated in deposition testimony that he did not have personal knowledge that each shipment of Mostek's HF wastes were effectively treated and neutralized. *Id.*, at 630. Neither did Brown have personal knowledge that, of the batches of HF wastes which were treated, each batch was subsequently titrated to determine the effectiveness of the treatment. *Id.*, at 628. Brown's qualifying statements that he had no reason to believe that the HF wastes were not properly treated and that the treatment was not effective are insufficient to meet Defendants' burden to show or raise a material question of fact as to whether or not Mostek's wastes did not contribute to the cleanup costs.

### (2) Evidence of HF or Arsenic at the Site

Defendants also argue that the absence of any data in Plaintiffs' report on the assessment of contamination at the Site which would indicate the presence of HF in any samples of soil or groundwater further supports their position. Plaintiffs admit that the investigation conducted on the samples of environmental media collected at the Site were not tested for the presence of HF or fluorides, thus, there is no direct evidence that HF or calcium fluoride which would result from the treatment of HF was released at the Site. PLAINTIFFS' EXHIBIT 6, DECLARATION OF DR. EUGENE MEYER. However, Plaintiffs seek to hold Defendants liable for the release or threatened release of HF contaminated with arsenic. Plaintiffs evidence clearly supports a finding that arsenic was released or threatened release at the Site. *See* PLAINTIFFS' EXHIBIT 6, DECLARATION OF DR. EUGENE MEYER; PLAINTIFFS' EXHIBIT 2, SITE INVESTIGATION REPORT.

In response, Defendants urge the Court to find Plaintiffs' evidence of expert testimony proffered to establish that Mostek's wastes included arsenic is unreliable and insufficient to show Mostek's wastes contributed to the release or threatened release of arsenic. The Court finds Plaintiffs' evidence establishes that Mostek's wastes were contaminated with arsenic.

Plaintiffs' evidence of Dr. Eugene Meyer's expert opinion discusses Mostek's wastes sent to the Site.[3] Dr. Meyer based his opinions on a review of the Site Investigation, Bio–Ecology Site, Grand Prairie, Texas; a review of other documents describing the history and the operations that formerly occurred at the Site; the deposition testimony of Harold Rickie Meyer, and a discussion with Robert Scace. PLAINTIFFS' EXHIBIT 6, DECLARATION OF DR. EUGENE MEYER. According to Dr. Meyer, Mostek manufactured arsenic-doped silicon wafers utilizing processes which generated chemical wastes of hydrofluoric acid containing arsenic in the form of either arsenic pentoxide or arsenic acid. *Id.* From Rickie Meyer's testimony that Mostek's process of manufacturing silicon wafers included a step of implanting arsenic on the wafer, Dr. Meyer concluded that the subsequent wash with hydrofluoric acid necessarily contained remnants of arsenic which was used in the manufacturing process. *Id.* Plaintiffs' evidence further shows that arsine gas was used by Mostek from 1973 through 1979. PLAINTIFFS' EXHIBIT 2, DECLARATION OF DURWOOD BOLDING.

---

3. Defendants object to Dr. Meyer's declaration, arguing the evidence cannot support Plaintiffs' motion for summary judgment because Dr. Meyer's statements are not based on personal knowledge as required by Fed.R.Civ.P. 56(e). The requirement of personal knowledge is fundamental in the rules of evidence, however, the use of expert testimony is a well established exception. In order to safeguard against abuses of this exception, the Federal Rules of Evidence, Rules 702–706, set forth specific requirements for foundation, qualification, and use of the expert's opinion as evidence.

For purposes of addressing the issues in the instant motions, the Court is satisfied that Dr. Meyer is qualified to deliver the opinions set forth in his declaration. The Court is further satisfied that the proper foundation for Dr. Meyer's opinions and conclusions is established in his declaration. Defendants' objection is overruled.

Defendants offer the evidence of Bob Smith's declaration that Mostek did not use arsenic in the semiconductor manufacturing process in which the HF wastes were generated. DEFENDANTS' EXHIBIT 1, DECLARATION OF BOB SMITH. From 1974 until 1984, Smith worked in Mostek's deionized water plant as a technician and, during the later years, as foreman. The Court finds Smith's declaration about what chemicals were stored and used by Mostek is insufficient to support Defendants' assertions. Although Smith may have had occasion to be around the chemicals stored at Mostek's facilities, the Court is not persuaded that, if Mostek used arsenic in its manufacturing process, Smith would have known or would have seen stored containers of arsenic.

Further, Defendants argue Dr. Meyer's opinion is insufficient for the Court to find Mostek's wastes included arsenic because, in part, Dr. Meyer's opinion is based on Rickie Meyer's testimony about Mostek's activities for a period after 1980. Defendants have not provided evidence to support this assertion. Although the Court was directed to page seven of Rickie Meyer's deposition, page seven does not appear in Defendants' Exhibit 3. Even if Rickie Meyer's discussion based on his personal knowledge does not specifically detail Mostek's manufacturing processes prior to 1980, Defendants have not presented any evidence to show that Mostek's processing changed from the processing implemented during 1976–1977. Bolding's declaration that, from 1973 through 1979, Mostek received deliveries of cylinders of arsine gas for use in its semiconductor manufacturing process, coupled with Rickie Meyer's testimony that Mostek's processes continued to use arsenic in its manufacturing, satisfies the Court that Mostek's HF wastes were contaminated with arsenic. Defendants' argumentative attack on Plaintiffs' evidence of Mostek's wastes containing arsenic is unsupported by any evidence to controvert or even raise a question of material facts so as to preclude the grant of Plaintiffs' motion for summary judgment as to liability. Further, the Court finds Defendants' evidence fails to show that

Mostek's arsenic contaminated HF wastes were treated so that they did not contribute to the release or threatened release of hazardous substances.

## 2. Divisibility

■ Defendants further urge the Court to deny summary judgment because material questions of fact on the issue of divisibility remain. In seeking to avoid the imposition of joint and several liability, the defendant bears the burden of establishing a reasonable basis for apportioning liability (a question of law), as well as showing the amount of harm it caused (a question of fact). *Bell,* 3 F.3d at 896; *Alcan,* 990 F.2d at 722 (citations omitted). Thus, the Court agrees with Defendants that the fact intensive determination of apportionment of harm is rarely suitable for summary adjudication. However, the Court must first determine whether or not there exists a reasonable basis for apportioning liability.

■ "Whether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant." *Bell,* 3 F.3d at 903. Evidence that would establish that the harm caused is subject to a reasonable apportionment includes "proof disclosing the relative toxicity, migratory potential, degree of migration, and synergistic capacities of the hazardous substances at the site." *Bell,* 3 F.3d at 899.

■ Defendants' four page legal argument, urging the Court to deny summary judgment because of factual issues of divisibility, fails to direct the Court's attention to evidence establishing a reasonable basis for apportioning liability. Defendants' failure to satisfy their burden of presenting evidence from which the Court could determine the amount of harm caused by each defendant mandates the Court's ruling in favor of Plaintiffs.[4] The Court concludes that CTU, having assumed all of the debts, liabilities and obligations of Mostek, is jointly and severally

---

**4.** The Court's determination of CTU's liability is subject to resolution of Plaintiffs' Motion for Summary Judgment as to Affirmative Defenses of

CTU of Delaware and United Technologies, and/or subject to determination at trial.

liable for the response costs incurred in the cleanup of hazardous substances at the Site.

## II. LIABILITY OF UTC

Plaintiffs seek summary judgment that UTC is jointly and severally liable as the successor in interest to and as the alter ego of CTU. Plaintiffs assert the corporate veil between UTC and CTU should be pierced in order to hold UTC responsible for response costs on a theory of derivative liability. Additionally, Plaintiffs argue UTC should be held liable as the sole shareholder of CTU which is dissolved de facto.

UTC moves for summary judgment on the grounds that as a matter of law there is no basis for piercing CTU's corporate veil and holding its parent UTC liable for Mostek's waste disposal activities that occurred before CTU merged with Mostek. UTC further argues that CTU is not dissolved de facto, thus, holding UTC liable as the sole shareholder would be unwarranted.

### A. PIERCING THE CORPPORATE VEIL

#### 1. Nexus between UTC and Mostek

UTC asserts Plaintiffs have not established a sufficient nexus between UTC and the arrangement for disposal of hazardous wastes by Mostek. Plaintiffs counter that there is no nexus requirement in cases seeking the imposition of derivative liability. The Court does not agree with UTC's case interpretations, but agrees with Plaintiffs that no showing of a nexus is required under a theory of derivative liability.

■ Liability for CERCLA violations may be sought under a theory of (1) direct liability or (2) derivative liability. Direct liability will extend to a party only where there is a nexus to the decision on the disposition of the hazardous substance. *See Riverside Market Dev. v. Intern. Bldg. Products*, 931

F.2d 327, 330 (5th Cir.1991).[5] Conversely, derivative liability does not require actual participation in the wrongful conduct. A parent corporation will be held derivatively liable for the acts of its subsidiary only upon the factual determination that corporate formalities should be disregarded, the corporate veil should be pierced. *Joslyn Mfg. Co. v. T.L. James & Co.*, 893 F.2d 80, 83 (5th Cir. 1990). Accordingly, there is no nexus requirement for a finding of derivative arranger liability.

#### 2. Alter Ego

■ The parties agree that federal common law of corporate veil piercing should be applied in CERCLA actions. Generally, " 'a corporate entity may be disregarded in the interest of public convenience, fairness and equity.' " *In re Acushnet River*, 675 F.Supp. 22, 33 (D.Mass.1987) (*citing Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981)).[6] Courts generally limit veil piercing to situations in which the corporate subsidiary is (1) established to perpetrate a fraud (or if its shareholders drain the corporation's assets) or (2) totally dominated and controlled by the parent corporation as its business conduit, as its alter ego. *United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir.1985). Plaintiffs neither assert nor attempt to show CTU was established to perpetrate a fraud, accordingly, the Court reviews the record for evidence of UTC's establishment of CTU as its alter ego.

■ For liability to attach under the alter ego doctrine, the control required "amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation" with no separate mind, will or existence of its own. *Jon–T*, 768 F.2d at

**5.** Although Plaintiffs discuss direct liability in their response to UTC's motion, Plaintiffs' Surreply to UTC's motion for summary judgment indicates liability is sought under the theory of derivative liability, not direct liability.

**6.** *See also First Nat'l City Bank v. Banco Para El Com.*, 462 U.S. 611, 630, 103 S.Ct. 2591, 2601–02, 77 L.Ed.2d 46 (1983) (*citing Bangor Punta*

*Operations, Inc. v. Bangor & Aroostook R. Co.*, 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974) (" 'Although a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy.... ' ")).

691 (citations omitted). Under general corporate law principles, the relevant inquiry into the control issue focuses on the relationship between the parent and the subsidiary *at the time the acts complained of took place.* *See Craig v. Johns–Manville Corp.,* 1987 WL 10191, 1987 U.S. Dist. LEXIS 4075, *35 (E.D.Penn. Mar. 31, 1988) (*citing* W. Fletcher, Cyclopedia of the Law of Private Corporations, Sec. 43.10, at 490) ("Common to all theories under which the corporate veil may be pierced is the requirement that plaintiff show control of one corporation over the other at the time of the acts complained of."); *Wm. Passalacqua Builders v. Resnick Developers,* 933 F.2d 131, 138 (2nd Cir.1991) (citation omitted); *Radaszewski By Radaszewski v. Telecom Corp.,* 981 F.2d 305, 306 (8th Cir.1992) (citation omitted); *Kilka v. Aerolite SPE Corp.,* No. 82–522, slip op. at 8 (N.D.Ohio Jan. 7, 1984). The rationale underlying this principle is that the parent must be in control of the subsidiary to be held liable for the subsidiary's actions. In Kilka, the court refused to pierce the corporate veil on an alter ego theory based on the undisputed fact that the parent corporation had not attained the status of parent to, thus could not have controlled, the subsidiary at the time of the alleged wrongful conduct.

The factual posture of this case is similar to that of *Kilka,* though one step removed. As noted above, Mostek shipped hazardous waste to the Site from June 1976 through September 1977. During this time period, not only did UTC have no connection with the activities of Mostek, UTC had no connection with CTU which was, at that point in time, nonexistent.

CTU was originally incorporated under the name Speco Corporation on January 26, 1978. UTC has been the sole shareholder of CTU since November 1978. On September 26, 1979, UTC, through CTU, entered into an agreement to acquire Mostek Corporation. CTU acquired Mostek in March 1980, simultaneously changing its name to Mostek Corporation. The Mostek subsidiary operated from 1980 to 1985. Based on these facts, the Court finds the relevant point in time for the analysis of UTC's control over its subsidiary CTU/Mostek begins in 1979 and 1980, during the time UTC negotiated the agreement to acquire and CTU did acquire liability for the alleged wrongful conduct of Mostek.

 The evidence provided by Plaintiffs primarily addresses activities and operations from the early 1980's to the present while the evidence of Defendants focuses on activities and operations of UTC and CTU during the mid to late 1970's. In the absence of evidence establishing material facts regarding the activities of UTC and CTU beginning in 1979 and later, the Court is unable to determine whether CTU operated as the alter ego of UTC so as to justify piercing the corporate veil. Accordingly, the motions for summary judgment on this basis must be denied.

## C. SHAREHOLDER DERIVATIVE LIABILITY

Plaintiffs argue UTC, as the sole shareholder of CTU, should be held liable to the extent that UTC received proceeds from or related to the sale of most of the assets of Mostek to Thomson Semiconductors, under the doctrine of de facto dissolution. UTC argues Plaintiffs failed to make any showing that CTU should be considered a de facto dissolved corporation under controlling precedent. Further, UTC argues Plaintiffs failed to show that UTC received any assets in the form of Mostek sale proceeds from CTU.

### 1. De Facto Dissolution

 De facto dissolution may be shown with evidence that the corporation has no property; no meetings are held, no officers are elected, and no business or corporate functions conducted. *United States v. Playa De Flor Land & Improvement Co.,* 160 F.2d 131, 134 (5th Cir.1947). UTC states CTU's assets were liquidated from November 1985 to October 1989. UTC also does not dispute that CTU has not conducted any significant business operations since June 1987, and CTU has conducted no business operations at all since 1989. Thus, the record shows that the purpose for CTU's corporate existence has been abandoned for the past ten years. Furthermore, the evidence shows that, although CTU had officers, at least between May 1992 and July 1993, there

were no officer meetings held. The Court finds the evidence in the record supports the finding that CTU is dissolved de facto.

### 2. Trace of Assets

 The Trust Fund doctrine, relied upon by Plaintiffs, permits "creditors of a dissolved corporation to pursue assets distributed to shareholders 'so long as the assets [are] traceable and [have] not been acquired by a bona fide purchaser.'" *North American Sav. v. Metroplex Dev. Partnership*, 931 F.2d 1073, 1078 (5th Cir.1991). However, as UTC points out, an indispensable element of Plaintiffs' case is "proof of the value or identity of assets received from the corporation" by the shareholder. *Id.* at 1079–80. Because a shareholder receives assets from a corporation in dissolution as a true constructive trustee, the shareholder's liability is limited to in rem, subject to traceability into the hands of third parties. *Id.* at 1080.

 Plaintiffs' sparse, indirect evidence clearly does not establish that UTC received CTU's assets in the form of proceeds from the sale of Mostek's assets to Thomson Semiconductors. However, the Court finds the evidence is sufficient to raise a material question of fact based on the inference naturally derived from an otherwise unexplained reduction occurring during the time when Mostek's assets were sold.

Plaintiffs offer evidence of a reduction in the intercompany payable between CTU and UTC from $310,293,566 to $222,850,510. Plaintiffs argue that this reflects a credit from UTC to CTU related to the proceeds that UTC received from the sale of the Mostek assets to Thomson. The deposition testimony of Perschbacher shows that such a reduction does reflect a credit from UTC to CTU. PLAINTIFFS' EXHIBIT 37. Further, Perschbacher agreed that proceeds from any transaction of CTU with a third party distributed to UTC would be reflected as a reduction in the intercompany payable. *Id.* Although the evidence does not conclusively establish Plaintiffs' assertion that the credit resulted from a transfer of Mostek asset-sale proceeds to UTC, the evidence supports such an inference. There is no evidence support-

ing an inference of any other accounting for the change in the balance; no evidence of other transactions to explain the reduction from $310,293,566 to $222,850,510. Accordingly, the Court declines to grant either parties' motions for summary judgment as to the liability of UTC as the sole shareholder of CTU.

### D. SUBSTANTIAL CONTINUITY

In Plaintiffs' Repl//Sur-reply, for the first time, Plaintiffs argue the substantial continuity rule should be applied to the facts of this case in order to hold UTC liable as the mere continuation of CTU. The Court notes that Defendants were not given an opportunity to respond to this newly asserted basis for imposing liability on UTC. However, the Court is not swayed by Plaintiffs argument and addresses the issue merely to explain the inapplicability of the substantial continuity test.

 In *United States v. Mexico Feed and Seed Co., Inc.*, the Eighth Circuit discussed the purpose of and set forth the substantial continuity test. *United States v. Mexico Feed and Seed Co., Inc.*, 980 F.2d 478, 487 (8th Cir.1992). To prevent corporations from evading their liabilities through transactional technicalities, an "asset purchaser" will be considered a corporate successor if it falls within one of four categories, one of which is that "[t]he purchasing corporation is merely a continuation of the selling corporation". *Id.* (citation omitted). The "mere continuation" theory emphasizes an "identity of officers, directors, and stock between the selling and purchasing corporations." *Id.* (citation omitted). Although Plaintiffs argue the evidence establishing the identity of officers, directors and stock between UTC and CTU invokes the application of the "mere continuation" theory, the Court disagrees. Plaintiffs have provided no basis for extending the application of the theory which is an exception to "the traditional rule that mere *asset purchasers* are not liable as successors". *Id.* (emphasis added). There is no evidence that UTC is an asset purchaser, therefore, the Court finds no basis for Plaintiffs' argument.

## III. LIABILITY OF the UNITED STATES and the STATE of TEXAS

Defendants filed a cross-motion for summary judgment as to the liability of the United States and the State of Texas, asking the Court to find the United States Air Force, the State of Texas' Department of Agriculture, and the University of Texas at Dallas (collectively, "the Agencies") liable for response costs at the Site. On July 17, 1995, this Court entered its Memorandum Opinion and Order granting the motions for entry of the Consent Decree representing a settlement between the United States and the majority of the defendants. The Consent Decree resolves the liability of the Agencies with respect to response costs incurred by the EPA and the State at the Site by providing for partial reimbursement of those response costs. The Consent Decree expressly provides protection to the settling defendants from actions for contribution regarding matters addressed in the settlement, as sought by Defendants. 42 U.S.C. § 9613(f)(2).

Defendants argue the Agencies are not entitled to contribution protection and further assert the United States' liability precludes the imposition of joint and several liability on Defendants. Based on the applicable law and the Court's findings as discussed in the Court's July 17, 1995, order and as discussed herein, and for the same reasons pertinent hereto, the Court finds Defendants' cross-motion for summary judgment should be and is hereby denied.

## IV. Motion for Leave To Supplement the Record

Also before the Court is United States Motion for Leave to Supplement the Record, filed August 9, 1995. The response and reply were timely filed. Plaintiff requested leave to file additional evidence relating to the issue of piercing the corporate veil. The Court did not consider the evidence submitted by the parties on this issue but determined material fact issues precluded the grant of summary judgment on the issue of piercing the corporate veil. Accordingly, the Court finds this motion should be denied as moot.

## CONCLUSION

IT IS THEREFORE ORDERED that Plaintiffs' motion for summary judgment as to the joint and several liability of CTU is hereby **GRANTED.**

IT IS FURTHER ORDERED that Defendant UTC's motion for summary judgment is hereby **DENIED.**

IT IS FURTHER ORDERED that Plaintiffs' cross motion for summary judgment as to the joint and several liability of UTC is hereby **DENIED.**

IT IS FURTHER ORDERED that UTC's and CTU's cross motion for summary judgment as to the liability of the United States and the State of Texas is hereby **DENIED.**

IT IS FURTHER ORDERED that the United States' motion for leave to supplement the record is hereby **DENIED** as moot.