**UNITED STATES of America, Plaintiff,**

**v.**

**IRON MOUNTAIN MINES, INC., et al., Defendants.**

**STATE OF CALIFORNIA, Plaintiff,**

**v.**

**IRON MOUNTAIN MINES, INC., et al., Defendants.**

**And Related Cross–, Counter–, And Third–Party Claims.**

**No. Civ–S–91–768 DFL JFM.**

United States District Court,
E.D. California.

Sept. 30, 1997.

Paul B. Galvani, Ropes and Gray, Boston, MA, James W. Matthews, Ropes and Gray, Boston, MA, for Rhone–Poulenc Inc.

Thomas H. Hannigan Jr., Ropes and Gray, Boston, MA, Thomas G. Redmon, Wilke Fleury Hoffelt Gould and Birney, Sacramento, CA, for Rhone–Poulenc Basic Chemicals Co.

Michael Brian Hingerty, U.S. Environmental Protection Agency, Regional Counsel, San Francisco, CA, David B. Glazer, U.S. Department of Justice, Environmental Enforcement Section, San Francisco, CA, Yoshinori H. T. Himel, U.S. Attorney, Sacramento, CA, Martin F. McDermott, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for U.S.

Margarita Padilla, California State Attorney General, Oakland, CA, Sara J. Russell, Attorney General's Office of the State of California, Oakland, CA, for State of California.

MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

The United States and the State of California (together "the Government") are seeking to recover CERCLA response costs incurred in investigating and abating hazardous sub-

stance contamination at Iron Mountain Mine. *See* 42 U.S.C. § 9607(a). One of the defendants against whom the Government is seeking to recover is Rhône–Poulenc Basic Chemicals Co., Inc. To prevail, the Government must establish that Rhône–Poulenc is a responsible party as defined by CERCLA.[1] The Government and Rhône–Poulenc now cross move for partial adjudication on the limited issue of whether Rhône–Poulenc is a responsible party as the corporate successor to Mountain Copper Company, Ltd. ("Mountain Copper") and its subsidiaries, which owned and operated Iron Mountain Mine from 1896 to 1968.

Rhône–Poulenc's successorship, if it exists at all, is once removed. As a prior owner and operator of Iron Mountain Mine, it is undisputed that Mountain Copper is a responsible party as defined by CERCLA. *See* 42 U.S.C. § 9607(a)(2). However, Mountain Copper was dissolved some 30 years ago in 1968 when Stauffer Chemical Company ("Stauffer") acquired Mountain Copper's assets, including Iron Mountain Mine. It also is undisputed that thereafter Rhône–Poulenc became the corporate successor to Stauffer. Thus, the question of whether Rhône–Poulenc succeeded to Mountain Copper's liabilities hinges on whether Stauffer became the corporate successor to Mountain Copper. Stauffer's possible successorship to Mountain Copper is the exclusive focus of the cross motions.

## I.

In 1894, a group of British investors purchased the Iron Mountain Mine site,[2] and in 1896, they formed Mountain Copper, a British corporation, to mine the site. Mountain Coppers' corporate headquarters were in London, and all of the corporation's directors and executive officers were located there. Mountain Copper operated Iron Mountain Mine from 1896 to 1955. From 1955 onward, the Mine was operated by Mountain Copper's wholly-owned subsidiary, Mountain Copper of California, which was incorporated in California in 1955.[3] Mountain Copper and Mountain Copper of California extracted gold, copper, zinc, and pyrite from Iron Mountain Mine. The mining activity exposed sulfide deposits, which react with rainwater and groundwater to form acid mine drainage, the hazardous substance at issue in this litigation.

Around 1962, mining ceased at Iron Mountain Mine, although Mountain Copper continued to hold onto the site. During this period, the only active operation at Iron Mountain Mine was the operation of a copper cementation plant, which Mountain Copper had installed a few years earlier at the State's request. The purpose of the copper cementation plant was to reduce copper levels in the water that drained out of Iron Mountain Mine.[4] The small amount of copper cement retrieved from this process was sold, as were the small quantities of hematite present in the waste piles at Iron Mountain Mine.

In addition to maintaining Iron Mountain Mine, Mountain Copper of California operated a plant in Martinez, California, where chemicals were manufactured and sold. The

1. To recover CERCLA response costs, the Government must establish: (1) that the site is a "facility;" (2) that there has been a "release" or "threatened release" of a "hazardous substance" at the site; (3) that the persons involved are responsible parties as "owners" or "operators" of the site; and (4) that the government has incurred response costs. 42 U.S.C. § 9607(a); *United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

2. The Iron Mountain Mine site is 4,400 acres located nine miles northwest of Redding, California.

3. Mountain Copper had a second wholly-owned subsidiary, Iron Mountain Corporation, which was a passive holder of title to real estate in Shasta County. None of the parties contend that Iron Mountain Corporation's activities or corporate make-up affects the analysis of Stauffer's status upon acquiring Mountain Copper.

4. The term "plant" may be somewhat misleading. The copper cementation plant consists of a series of open-air cement compartments filled with iron shavings, over which the acid water from the mine flows. A chemical reaction occurs by which the copper in the mine water is removed and deposited as a solid or "cement" in the compartments, and the iron in the shavings is absorbed by the water. Operation of the copper cementation plant continued until 1994, when it was replaced by the treatment plant the EPA selected in ROD II. Today, the copper cementation plant remains intact as a backup means for controlling acid mine drainage.

operations at the Martinez plant included the production of copper, zinc, and iron chemicals including Ferric 27, as well as the sale of pyrite cinders generated from the mining operations at Iron Mountain Mine.

Mountain Copper's most valuable asset, however, was its stake in the San Francisco Chemical Company ("SFCC"). SFCC operated large phosphate mines in Idaho and Utah. Until 1956, Mountain Copper owned 100 percent of SFCC's stock. In 1956, Mountain Copper sold half of its shares to Stauffer. Thereafter, the two equal shareholders battled over the direction SFCC should take.

In the 1960's, Stauffer sought to gain control of SFCC. When Mountain Copper refused to sell its remaining one-half stake in SFCC, Stauffer decided to achieve its objective by taking control of Mountain Copper itself. Accordingly, Stauffer made a tender offer for all of Mountain Copper's outstanding stock in 1964. The tender offer was unsuccessful, resulting in Stauffer acquiring only 43 percent of Mountain Copper's outstanding stock. In July 1967, Stauffer made a second tender offer. By August 1967, Stauffer had acquired over 90 percent of Mountain Copper's outstanding stock. Under § 209 of the British Companies Act of 1948, Stauffer then was entitled to acquire Mountain Copper's remaining shares through the legal process. To satisfy British law, Stauffer's 1967 tender offer provided for 75 percent of the consideration to be paid in Stauffer's common stock and 25 percent in cash. The effect of Stauffer's successful tender offer was that Stauffer became the sole shareholder of Mountain Copper and its wholly owned subsidiaries.[5] It also became the sole shareholder of SFCC. At the time it took control over Mountain Copper, Stauffer intended to integrate Mountain Copper into Stauffer. On July 17, 1967, Roger Gunder, the President of Stauffer, wrote a memorandum describing the take-over. Mr. Gunder wrote that Stauffer "has purchased the assets of the Mountain Copper Company, Limited" and that once the dissolution of Mountain Copper and its subsidiaries had been finalized, SFCC would become a division of Stauffer while Mountain Copper's manufacturing operations would become part of Stauffer's Industrial Chemical Division. U.S.Exh. 6 (Exh. R). Immediately following Stauffer's acquisition of Mountain Copper's stock, Mountain Copper's Board of Directors was replaced with Stauffer directors, officers, and employees, and Mountain Copper's residence and corporate headquarters were transferred from Britain to the United States.

One of the reasons Stauffer wanted to dissolve Mountain Copper and integrate it into Stauffer was to obtain a tax deduction. Mountain Copper of California had significant tax losses from prior years that could be carried over. Stauffer hoped that by dissolving Mountain Copper, it could claim these losses against Stauffer's own income under § 381 of the Internal Revenue Code. The time for carryover on some of Mountain Copper of California's past losses was near expiration, such that the tax breaks would expire if the losses were not taken in 1968. Thus, on November 27, 1968, Mountain Copper's new Board of Directors resolved to wind up Mountain Copper. Stauffer, as Mountain Copper's sole shareholder, approved the dissolution on December 11, 1968, and Albert J. Steiss was appointed as the liquidator.[6]

As part of the liquidation process, Stauffer entered into an Assignment Agreement with Mountain Copper on December 19, 1968. U.S.Exh. 8 (Exh. 2 at 1). Under the terms of the Assignment, Mountain Copper transferred all of its assets to Stauffer. In return, Stauffer agreed to "assume all of the liabilities and contractual obligations of [Mountain Copper] and to surrender for cancellation all of its shares of stock [in Mountain Copper] ."

5. Stauffer was effectively the sole shareholder. To satisfy British regulations requiring that publicly traded companies, such as Mountain Copper, have at least seven shareholders, Stauffer transferred nominal shares in Mountain Copper to Mountain Copper's directors and one nominee shareholder. The directors and the nominee shareholder then reassigned their rights in the shares back to Stauffer.

6. Although Stauffer took steps to carry over Mountain Copper of California's losses, it is unclear whether Stauffer actually received or claimed any tax benefit from Mountain Copper losses.

The Assignment also provided that it was made pursuant to the resolution of Mountain Copper's Board of Directors calling for "the voluntary winding up of [Mountain Copper] ...."

Included in the assets transferred to Stauffer in the liquidation of Mountain Copper was all stock held by Mountain Copper, including Mountain Copper's shares in its wholly-owned subsidiary, Mountain Copper of California, and its one-half stake in SFCC. Shortly after receiving the Mountain Copper of California stock, Stauffer also dissolved that corporation.[7] On December 24, 1968, the Board of Directors for Mountain Copper of California resolved to wind up the corporation. R–P Exh. 36. And on December 31, 1968, Stauffer entered into a Grant Deed and Assignment with Mountain Copper of California, which transferred Mountain Copper of California's assets to Stauffer. R–P Exh. 39. In return, Stauffer agreed "to perform and discharge each and all of the contracts, obligations and liabilities of [Mountain Copper of California], including all known debts and liabilities of [Mountain Copper of California]...." The Grant Deed and Assignment also contained a proviso that limited Stauffer's liability such that:

> nothing herein shall be construed to toll or extend any statute of limitation or rule or period or laches or estoppel beyond the time the same would have run in favor of the Grantor, or to subject the Grantee to any liability other than that, or for any other or further period or extent than that, for which the Grantor would have been liable had this grant, assignment, assumption of liability, or agreement not been made....

R–P Exh. 39.

After Mountain Copper and Mountain Copper of California were dissolved and their assets were acquired by Stauffer as the sole shareholder, Iron Mountain Mine remained mostly inactive. Stauffer continued to operate the copper cementation plant and to sell the copper cement generated by the plant. Stauffer also continued to sell the hematite present in the waste piles. In 1967–68, Stauffer investigated reopening Iron Mountain Mine to extract pyrite that could be used to produce sulfuric acid at Mountain Copper's Martinez plant. Stauffer prepared a plan to reopen the Mine; obtained a bid; announced to the public its plans to reopen the Mine; and moved equipment to the Mine in anticipation of its reopening. Ultimately, Stauffer decided *not* to reopen Iron Mountain Mine because the price of sulfuric acid did not warrant it.

At the Martinez plant, Stauffer continued the production of zinc and iron chemicals and the sale of pyrite cinders, although it discontinued the production of copper chemicals and sold that business to a third party. In connection with the discontinuation of the copper chemicals business, Stauffer terminated all of the hourly employees at the Martinez plant. As to SFCC, Stauffer continued its mining operations and retained its managerial personnel and customers.

By the late 1960's when Stauffer took over and dissolved Mountain Copper and its subsidiaries, Mountain Copper had known about the pollution at Iron Mountain for a number of years. In the 1940's, the State had notified Mountain Copper that discharges from Iron Mountain Mine were toxic to fish. By the 1950's, Mountain Copper had become sufficiently concerned about the pollution that the corporation retained the Colorado School of Mines to advise it about how to handle the problem. At the State's request, Mountain Copper had built the copper cementation plant to ameliorate the problem.

Stauffer was also aware of the pollution at Iron Mountain Mine when it decided to take over Mountain Copper. In August 1967, W.L. Dixon, Stauffer's Vice President for West Coast Operations, visited Iron Mountain Mine. In his memorandum to Stauffer's officers and directors regarding the visit, Mr. Dixon wrote about the high copper content in the Mine's drainage, the regulations requiring Mountain Copper to remove the copper, and the copper cementation plant. Glazer Decl., Exh. 10. Other Stauffer employees had also met with Mountain Copper person-

7. Iron Mountain Corporation, another of Mountain Copper's wholly owned subsidiaries, also was dissolved at the same time.

nel to discuss the pollution at Iron Mountain Mine.[8]

II.

A corporation may be liable for response costs under CERCLA if the corporation is the corporate successor to a "responsible person" under CERCLA.[9] *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1262–63 (9th Cir.1990) (citation omitted); *accord B.F. Goodrich v. Betkoski*, 99 F.3d 505, 518–19 (2nd Cir.1996); *Unites States v. Mexico Feed & Seed Co. Inc.*, 980 F.2d 478, 486–87 (8th Cir.1992); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir. 1992); *Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245–48 (6th Cir.1991); *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91–92 (3rd Cir.1988). "[T]he issue of successor liability under CERCLA is governed by federal law." *Louisiana–Pacific*, 909 F.2d at 1263; *accord Betkoski*, 99 F.3d at 519; *Carolina Transformer*, 978 F.2d at 837–38; *Smith Land & Improvement*, 851 F.2d at 91; *contra City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 250 (6th Cir.1994). Because Congress has not defined the scope and requisites of successor liability in CERCLA, the courts have developed federal common law to supplement the statute. That federal common law is based upon the "general doctrine of successor liability in operation in most states."[10] *Louisiana–Pacific*, 909 F.2d at 1263.

Under federal law, successor liability generally does not arise when one corporation purchases the assets of a second corporation unless one of the following exceptions applies:

(1) [t]he purchasing corporation expressly or impliedly agrees to assume the liability;

(2) [t]he transaction amounts to a de facto consolidation or merger;

(3) [t]he purchasing corporation is merely a continuation of the selling corporation; or

(4) [t]he transaction was fraudulently entered into in order to escape liability.

8. Stauffer eventually sold the Iron Mountain Mine property to Iron Mountain Mine, Inc. in 1976. Rhône–Poulenc does not dispute that it is an "owner" under CERCLA for the limited period of Stauffer's ownership of the mine.

9. Although Congress did not explicitly include successor liability in CERCLA, courts have found that successor liability is implicit in the statute and consistent with Congress' goal of having the parties who created or maintained the hazardous conditions bear the cost of clean up. *See United States v. Mexico Feed & Seed Co., Inc.*, 980 F.2d 478, 486 (8th Cir.1992) (citations omitted); *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1263 n. 2 (9th Cir.1990). These courts reason that if successor liability were not available, corporations could evade their responsibilities "by dying paper deaths, only to rise phoenix-like from the ashes, transformed, but free of their former [CERCLA] liabilities." *Mexico Feed & Seed*, 980 F.2d at 487. Even in cases in which the corporation transforms itself in good faith rather than to evade CERCLA liabilities, a corporate successor "reaps the economic benefits of its predecessor's use of hazardous disposal methods, and, as the recipient of the benefits, is also responsible for the costs of those benefits." *Id.*

10. Rhône–Poulenc argues that *Louisiana–Pacific* is no longer good law in light of more recent Supreme Court opinions addressing when courts should create federal common law, as opposed to applying existing state law. *Atherton v. FDIC*, — U.S. —, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). But *O'Melveny* and *Atherton* do not represent a departure from Supreme Court precedent established at the time Louisiana–Pacific was decided. *See Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966). Moreover, those cases never addressed CERCLA, and no opinion written after *O'Melveny* or *Atherton* suggests that those cases affect the application of federal common law in CERCLA actions. *But see City Management*, 43 F.3d 244 (The Sixth Circuit has consistently held that state law should provide the rule of decision as to successor liability under CERCLA.)

Rhône–Poulenc also argues that state law applies because Stauffer's acquisition of Mountain Copper's assets was the result of Mountain Copper's dissolution and that the question of whether a dissolved corporation is liable under CERCLA is resolved using state law. CERCLA does not preempt state law on the issue of whether a dissolved corporation is subject to suit. *Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 817 F.2d 1448, 1451 (9th Cir.1987). But here the Government is seeking response costs from Rhône–Poulenc, a corporation that is still in existence; it is not seeking response costs from the dissolved Mountain Copper. As a result, federal law governs under the holding in *Louisiana–Pacific*.

*Id.* (citations omitted); *accord Betkoski,* 99 F.3d at 519; *Mexico Feed & Seed,* 980 F.2d at 487; *see generally* William M. Fletcher, 15 *Cyclopedia of the Law of Private Corporations* § 7122 (Perm. ed.1990). In this case, Stauffer's acquisition of Mountain Copper's assets was accomplished through the two tender offers—giving Stauffer control and ownership of Mountain Copper—and Stauffer's subsequent liquidation of Mountain Copper and the distribution of Mountain Copper's assets to Stauffer as its sole shareholder. While the series of transactions transferring Mountain Copper's assets to Stauffer was not a straightforward asset purchase, as a practical matter Stauffer acquired Mountain Copper's assets when it acquired all of Mountain Copper's stock. Indeed, the purpose of the stock buy out was to gain control of a particular asset—SFCC. In these circumstances, the transaction is properly treated as an asset purchase for purposes of successor liability under CERCLA, and there is considerable precedent in support of such treatment. *State of N.Y. v. Storonske Cooperage Co., Inc.,* 174 B.R. 366, 377 (N.D.N.Y.1994); *contra A.O. Smith Corp. v. Rheem Mfg. Co.,* C–94–3887 (N.D.Cal.1996), *appeal docketed,* 134 F.3d 376, 1998 WL 23670 (9th Cir.1998); *see Stoumbos v. Kilimnik,* 988 F.2d 949, 961 (9th Cir.1993) (successor liability can extend to "transfers other than straightforward purchases"); *Arnold Graphics Indus., Inc. v. Indep. Agent Center, Inc.,* 775 F.2d 38 (2nd Cir.1985) (asset transfer was sufficient to invoke successor liability where successor corporation acquired 100 percent of its predecessor's stock, and one year later, the predecessor corporation transferred its assets to its successor as part of the dissolution process); *see generally* Fletcher, 15 *Cyclopedia of the Law of Private Corporations* § 7122 ("where one company sells or otherwise transfers all of its assets to another company").[11] Thus, Stauffer will be deemed to be Mountain Copper's successor only if the transaction falls within one of the above exceptions.

The first exception to the general rule that successor liability does not arise out of an asset purchase is where the successor corporation has expressly assumed its predecessor's liability.[12] Here there were two assignment agreements with assumption of lia-

11. Rhône–Poulenc suggests that the *Storonske* and *Arnold Graphics* opinions defined "asset purchase" liberally to include asset transfers because the asset transfers involved fraud. However, neither case is limited to instances of fraud. Moreover, it is difficult to articulate a reason why a corporation that purchases an asset from another company may assume successor liability for the asset—because one of the exceptions to the general rule applies—while a corporation that buys all of the shares of another company, and then transfers assets to itself from the company that it now controls, would not assume liability simply because of the form of the purchase. Indeed, it would seem most appropriate to find an asset purchase and an exception to the rule of no successor liability precisely in the circumstance in which a corporation buys all of the stock of another company.

12. As a preliminary matter, Rhône–Poulenc argues that the Government has no standing to pursue relief under the assignments between Mountain Copper and its subsidiaries because the Government was not an intended third-party beneficiary to the assignments. But the Government is not seeking to enforce the assignments. Rather, the Government is seeking response costs under CERCLA by holding Rhône–Poulenc liable as a corporate successor to Mountain Copper. The assignments are evidence that Rhône–Poulenc is a corporate successor to Mountain Copper. Thus, the Government's standing to bring this action flows from CERCLA, not the assignments.

Rhône–Poulenc also argues that the Government does not have standing under CERCLA because § 107(e)(1) of CERCLA operates to prohibit any attempted transfer of CERCLA liability, such as the assignments in this case. Section 107(e)(1) provides that "[n]o agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section to any other person the liability imposed under this section." 42 U.S.C. § 9607(e)(1). Again this argument misperceives the basis of the Government's action. The Government is not suing on the assignments. If it were, the assignments would be ineffective to shield Mountain Copper and its subsidiaries from CERCLA liability. Rather, the Government sues on the basis of Mountain Copper's liability and argues that the fact of the assignment is evidence that Stauffer assumed successor liability under federal law when it purchased Mountain Copper's assets. Moreover, the intent of § 107(e)(1) is to expand, not restrict, the group of potentially responsible parties. Section 107(e)(1) ensures that if a party is found liable for response costs under § 107(a), "that party cannot escape liability by means of a contract with another party." *John S. Boyd Co., Inc. v. Boston Gas Co.,* 992 F.2d 401, 405 (1st

bility provisions, one between Stauffer and Mountain Copper and one between Stauffer and Mountain Copper of California. U.S.Exh. 8; Rhône–Poulenc Exh. 39. In the Mountain Copper Assignment, Stauffer "assum[ed] all of the liabilities and contractual obligations of [Mountain Copper]." In the Mountain Copper of California Assignment, Stauffer agreed "to perform and discharge" all of Mountain Copper of California's "obligations and liabilities." Rhône–Poulenc Exhs. 36, 39.

The Government argues that the broad language of the assignments unambiguously transferred all liability, including CERCLA liability, to Rhône–Poulenc. Rhône–Poulenc argues that the assignments are ambiguous and that the court therefore must consider extrinsic evidence in interpreting the assignments.[13] Rhône–Poulenc further argues that when the extrinsic evidence is considered, it is clear that the assignments only passed existing liabilities related to the dissolution of Mountain Copper and its subsidiaries. According to Rhône–Poulenc, the assignments did not pass unknown liabilities, such as liabilities under CERCLA, which was not even enacted until 12 years after the assignments were signed.

■ In support of its position, Rhône–Poulenc points to California law which generally provides that laws enacted after a contract was formed do not become part of the contract absent a clear statement that the parties intended otherwise.[14] *Swenson v. File*, 3 Cal.3d 389, 90 Cal.Rptr. 580, 582, 475 P.2d 852 (1970) (citations omitted). But that rule of interpretation ought not be applied to CERCLA liability because to do so would be inconsistent with CERCLA's retroactive application and with Congress' intention of assigning CERCLA liability broadly.[15] *See e.g.*

Cir.1993). Thus, if Mountain Copper and its subsidiaries still existed, the Government could pursue those corporations for payment of response costs as an owner and operator of Iron Mountain Mine. Any attempted transfer of CERCLA liability would be nullified under § 107(e)(1). Section 107(c)(1) does not impinge on successor liability, however. The Government still would be able to pursue Rhône–Poulenc on the ground that it is Mountain Copper's corporate successor.

13. In construing contract terms in connection with determining CERCLA liability, the Ninth Circuit has found that:

> ... [W]hether a contract is ambiguous is a question of law. When interpreting a contract, even when the document is unambiguous on its face, a judge is required to give at least a preliminary consideration to all credible evidence offered to prove the intention of the parties. However, after considering the evidence, the court may then exclude it if it tends to prove a meaning of which the language of the contract is not reasonably susceptible. If the court finds that the language of the contract is not reasonably susceptible to the suggested interpretation, and excludes the evidence, the case may then be disposed of by summary judgment.

*Jones–Hamilton Co. v. Beazer Materials & Services*, 973 F.2d 688, 692–93 (9th Cir.1992) (citations and internal quotations omitted).

14. In addition to citing California caselaw for the proposition that after-enacted statutes are not incorporated into contracts, Rhône–Poulenc makes two additional arguments. First, Rhône–Poulenc argues that Stauffer could not have assumed Mountain Copper's CERCLA liability because Mountain Copper and its subsidiaries never had CERCLA liability given that those corporations were dissolved prior to CERCLA's enactment. However, the caselaw draws a distinction between capacity to be sued and successor liability. *See Louisiana–Pacific*, 909 F.2d at 1263 n. 1 (distinguishing *Levin Metals*, 817 F.2d 1448); *see also supra* note 10. Thus, while Mountain Copper might not be capable of being sued because of its dissolution, Rhône–Poulenc will be subject to liability if it is appropriately characterized as a corporate successor under federal law. The dissolution of Mountain Copper, whether before or after CERCLA's enactment, is not relevant to the inquiry. Second, Rhône–Poulenc argues that even an express assumption of a corporation's liability by a shareholder upon dissolution does not increase the shareholder's limited liability under California law. *Gateway Structures, Inc. v. Carpenters' 46 Northern California Counties Conference Bd.*, 681 F.Supp. 1437, 1444 (N.D.Cal.1987). Again, Rhône–Poulenc is confusing the issue. The Government is not seeking to impose liability on Stauffer as Mountain Copper's sole shareholder; rather, it is seeking to impose successor liability on Rhône–Poulenc, in part, by finding that Stauffer is the corporate successor to Mountain Copper.

15. In construing agreements to determine whether a corporation has expressly assumed the CERCLA liability of its predecessor, courts have turned to state contract law to fill in the federal law "so long as it is not hostile to the federal interests animating CERCLA." *John S. Boyd*, 992 F.2d at 406; *see Jones–Hamilton*, 973 F.2d at 692–3 (using California law to construe an indemnity agreement in connection with CERCLA liabilities); *but see Wiegmann & Rose Int'l v. NL*

*United States v. Olin Corp.*, 107 F.3d 1506, 1511 (11th Cir. Mar.25, 1997) (CERCLA applies retroactively); *see generally Long Beach Unified Sch. Dist. v. Dorothy B. Godwin California Living Trust*, 32 F.3d 1364, 1366 (9th Cir.1994) (discussing how broadly CERCLA has been read). There are many precedents for the proposition that CERCLA liability can be assumed by a pre-CERCLA agreement so long as the agreement contains "language broad enough to allow us to say that the parties intended to transfer either contingent environmental liability, or all liability." *John S. Boyd*, 992 F.2d at 406; *accord Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3rd Cir.1994).

Here, the two assignments explicitly provided that Stauffer assumed all liabilities. U.S.Exh. 8 (Stauffer will assume "all of the liabilities" of Mountain Copper); R-P Exh. 39 (Stauffer will discharge "all of the ... liabilities" of Mountain Copper of California). Courts universally have held that language transferring "all liabilities" is sufficiently broad to include environmental liability.[16] *See Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 309–10 (3rd Cir.1985) (CERCLA liabilities included in "all the debts, obligations and liabilities"); *HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F.Supp. 318, 332–33 (D.Md.1993) ("all liabilities and obligations, liquidated or unliquidated"); *see also Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 15–16 (2nd Cir.1993) ("all liabilities (absolute or contingent)"); *Purolator Products Corp. v. Allied-Signal, Inc.*, 772 F.Supp. 124, 131–32 (W.D.N.Y.1991) (finding the parties intended transfer where indemnification agreement referred to "all liabilities"). This includes the Ninth Circuit. *Jones-Hamilton*, 973 F.2d at 693. The only exception is where other clauses in or attachments to the agreement make it clear that the parties did not intend to include environmental liabilities. *Philadelphia Electric Co.*, 762 F.2d at 310 ("clear and specific language" must be used "to effect the exclusion of unknown or contingent liabilities"); *see Beazer*, 34 F.3d at 217 (unclear if CERCLA liability included where indemnification clause limited to "applications now pending and listed on Exhibit F hereto"); *John S. Boyd*, 992 F.2d at 407 (CERCLA liability not included in the "all liabilities" language where the covered liabilities were explicitly listed); *United States v. Vermont Am. Corp.*, 871 F.Supp. 318, 321 (W.D.Mich.1994) ("all liabilities" "reflected or reserved against on the December 31, 1979 balance sheet" or "disclosed in the Disclosure Letter" or "existing on the Closing Date" does not include later CERCLA liability); *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 1996 WL 67216 at *3–4 (N.D.Ill.1996)

*Industries*, 735 F.Supp. 957, 962 (N.D.Cal.1990) (creating federal common law in construing an "as is" provision in a land deed). But where state contract law frustrates the purposes underlying CERCLA—to remediate hazardous substance contamination and to have those responsible for the contamination pay for the clean-up—federal law will supersede the state law. Supersession is appropriate here.

16. The parties disagree over how to characterize the assignments. The Government contends that the assignments are assumption of liability agreements. Rhône-Poulenc argues that the assignments are indemnity agreements. A few circuit courts have held that indemnity agreements are to be "strictly construed" such that "a clear and unmistakable intent to indemnify" must be manifested. *Hatco Corp. v. W.R. Grace & Co.*, 59 F.3d 400, 405 (3rd Cir.1995) (citations omitted); *Beazer East*, 34 F.3d at 216. These assignments, however, cannot be characterized as indemnity agreements. An indemnity agreement in the CERCLA context is an agreement by which one party agrees to reimburse another party for response costs associated with the clean-up of hazardous substance contamination. Indemnity agreements do not nullify the second party's underlying CERCLA liability; they only serve to shift the ultimate financial loss onto the first party. *Hatco*, 59 F.3d at 404. Here, Stauffer agreed to assume the liabilities of Mountain Copper and its subsidiaries in connection with the dissolution of those corporations. As a result, Stauffer could not have been agreeing to indemnify Mountain Copper and its subsidiaries because those corporations ceased to exist when they were dissolved. Moreover, it appears that California law does not adhere to the rule that indemnity agreements must be "strictly construed." In *Jones-Hamilton*, the Ninth Circuit held that if the parties had intended to limit the scope of the indemnity agreement, they would have made it clear. 973 F.2d at 693; *compare Schwartz v. Pillsbury*, 969 F.2d 840 (non-CERCLA case holding that indemnity clause that is expressly limited to "leases, agreements, contracts, plans and commitments" listed in the balance sheet and "all other agreements and contracts entered into in the ordinary course of business" does not lead to successor liability for fraud.).

("all liability for container during loading, unloading and transporting operations" does not include all CERCLA liability).

Rhône–Poulenc argues that the "all liabilities" language in the two assignments was modified by other clauses, suggesting the parties only intended to transfer liabilities that existed at the time the assignments were signed. According to Rhône–Poulenc, the parties entered into the two assignments with the sole purpose of protecting the liquidator, Albert J. Steiss. At the time of Mountain Copper's liquidation, British law mandated that, before a corporation could be dissolved, its creditors had to be notified and permitted to recover the amount owed them. Only after all creditors had been paid could the remaining assets of the corporation be distributed to its shareholders. The dissolution process typically took a year or longer. According to Rhône–Poulenc, Stauffer needed to accelerate the process in order to take full advantage of Mountain Copper of California's losses to reduce Stauffer's taxes. To protect the liquidator from personal liability for the early distribution of Mountain Copper's assets, Stauffer was required to enter into the assignments to assure that Stauffer would cover all debts owed to creditors. Those debts amounted to £43,000 and were primarily English taxes owed by Mountain Copper.

But the clauses Rhône–Poulenc highlights do not support its argument that the sole purpose for the assignments was to protect the liquidator from personal liability for Mountain Copper's existing debts. Rhône–Poulenc cites to the clause in the December 19 assignment, providing that the assignment was entered into as part of the "voluntary winding up of [Mountain Copper]...." Rhône–Poulenc also cites to language in the December 31 assignment. That assignment describes all liabilities as "including all known debts and liabilities of [Mountain Copper of California]...." and contains a proviso that "nothing herein shall be construed to ... subject [Stauffer] to any liability other than that ... for which [Mountain Copper of California] would have been liable had this ... agreement not been made...." The first two of these clauses are not even limiting in nature. For example, the word "including" must mean that "known debts" are a subset of the liabilities covered by the assignment. And the proviso merely makes Stauffer's liability coextensive with that of Mountain Copper of California as it existed when the assignments were signed.[17] *Compare Vermont Am. Corp.*, 871 F.Supp. at 321 (limiting liabilities to those "existing on the closing date").

Moreover, the circumstances surrounding the dissolution of Mountain Copper and its subsidiaries and the execution of the two assignments support the conclusion that "all liabilities" meant all liabilities, including environmental liability.[18] Stauffer did not purchase a component of Mountain Copper's business or a portion of its assets. Rather, through its acquisition of all of Mountain Copper's stock and the dissolution of the corporation, Stauffer absorbed all of Mountain Copper into itself.[19] This was Stauffer's intention from the beginning. In 1967, Roger Gunder, the President of Stauffer, out-

17. Rhône–Poulenc interprets the proviso as limiting Stauffer's liability to that of Mountain Copper of California as a dissolved corporation. That interpretation is unreasonable because it would transform the signing of the assignment into an empty exercise. At the same time the parties signed the assignment, the assigned liability would be extinguished by the dissolution of Mountain Copper of California.

18. Rhône–Poulenc submitted extrinsic evidence in support of its view that the parties did not intend to transfer environmental liabilities through the two assignments. *E.g.* MacDougall Decl. The court has considered Rhône–Poulenc's evidence but has excluded it as supporting a meaning of the assignments to which the language is not reasonably susceptible. *See Jones–Hamilton*, 973 F.2d at 692–93.

19. The second exception to the general rule that successor liability does not arise out of an asset purchase—the de facto merger exception—is an equitable doctrine, recognizing that successor liability may attach "where one corporation is absorbed by another, but without compliance with the statutory requirements for a merger." *Arnold Graphics*, 775 F.2d at 42 (citing *Ladjevardian v. Laidlaw–Coggeshall, Inc.*, 431 F.Supp. 834, 838 (S.D.N.Y.1977)). Because Stauffer expressly assumed all of Mountain Copper's liabilities, the court need not address whether the Government has established that Rhône–Poulenc is a corporate successor to Mountain Copper under the de facto merger exception. The court notes, however, that many of the requirements for a de facto merger are satisfied in this case.

lined the planned acquisition, stating that both Mountain Copper and SFCC would become divisions of Stauffer.[20] U.S.Exh. 6. Indeed, Stauffer needed to absorb Mountain Copper in order to realize the tax savings it hoped to receive from offsetting Mountain Copper of California's losses against Stauffer's own profits.

The effect of Stauffer's absorption of Mountain Copper was that Stauffer alone had the power to continue, to halt, or to alter Mountain Copper's operations. For the most part, Stauffer chose to continue Mountain Copper's operations unchanged. For example, Stauffer continued to hold Iron Mountain Mine, although the Mine remained mostly inactive. But Stauffer could have resumed mining there and likely would have resumed mining if it would have been profitable to do so. Stauffer also had the power to fire or to retain Mountain Copper's employees. Stauffer exercised its power in dismissing all of the hourly employees at Mountain Copper of California's Martinez plant when it sold the copper chemical business. Cogliatti Decl., ¶ 5.

Stauffer's determination to absorb all of Mountain Copper, such that Stauffer had absolute control over every aspect of Mountain Copper's operations and work force, suggests that Stauffer understood when it assumed "all liabilities" that the phrase referred to every aspect of Mountain Copper's business.

Another factor indicating that Stauffer intended to assume all of Mountain Copper's liabilities, including environmental liability, was Stauffer's knowledge of the pollution problems at the Iron Mountain Mine site. In August 1967, W.L. Dixon, Stauffer's Vice President for West Coast Operations, visited Iron Mountain Mine. Mr. Dixon later wrote to Stauffer's officers and directors that:

> The drainage from the underground mines has a very high content of copper and iron and Federal regulations require Mountain Copper to remove the copper from these waters. This they are doing by precipitating the copper with iron and producing a copper cement which amounts to approximately equivalent metallic copper of 50–60 tons per year.

Glazer Decl., Exh. 11. Prior to Dixon's visit, other Stauffer employees had met with Mountain Copper personnel to discuss the pollution problem at Iron Mountain Mine. Given that Stauffer was aware of the pollution problem at Iron Mountain Mine, it could have sought to exclude environmental liability from the liabilities it assumed. It did not do so.[21]

Finally, even if the court were to accept Rhône–Poulenc's argument that the sole purpose for signing the assignments was to protect the liquidator, it does not follow that Stauffer only intended to protect the liquidator from *existing* debts. The liquidator would have demanded that he be protected from all liability, not just liability known at the time the dissolution proceedings began. Thus, Stauffer surely intended to assume Mountain Copper's potential liability for environmental injury during the dissolution proceedings.

Given the unambiguous language of the assignments in which Stauffer assumed "all liabilities" of Mountain Copper and its subsidiaries and the circumstances surrounding the signing of the assignments, Stauffer expressly assumed the CERCLA liability of Mountain Copper. As a result, it follows

20. In other correspondence, Stauffer referred to its acquisition of Mountain Copper as a merger. *E.g.* U.S.Exh. 14 (November 1969 letter from Fred Waiss providing that Mountain Copper was "liquidated and merger in to Stauffer Chemical Company which is the surviving company of the reorganization"); *but see* Rhône–Poulenc Exh. 49 (later correspondence characterizing the transaction as a "winding up" or "liquidation" of Mountain Copper).

21. Rhône–Poulenc argues that in the late 1960's the State was satisfied with Stauffer's efforts to abate the pollution and that the parties could not have foreseen that a comprehensive and draconian environmental statute, such as CERCLA, would be enacted. At that time, the pollution discharged from Iron Mountain Mine was regulated by a few laws, such as the Dickey Water Pollution Act, former Cal. Water Code §§ 13000–64. Assuming Rhône–Poulenc's arguments are correct, Stauffer still knew of the pollution problem at Iron Mountain and of the State's nascent efforts to regulate water pollution. And it is the knowledge of the existence of facts necessary for CERCLA liability, not the knowledge of CERCLA liability itself, that is dispositive under the relevant case law. *Hatco*, 59 F.3d at 409.

that Stauffer is the corporate successor of Mountain Copper, and that Rhône–Poulenc, standing in the shoes of Stauffer, is now the corporate successor of Mountain Copper.

For the above stated reasons, the Government's motion for partial adjudication is GRANTED, and Rhône–Poulenc's motion for partial adjudication is DENIED.

IT IS SO ORDERED.